# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EAT HERE BRANDS, LLC, *et al.*[1], | ) | Lead Case No. 19-61688-WLH |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**MOTION OF DEBTORS FOR ENTRY OF (I) AN ORDER (A) AUTHORIZING AND APPROVING BID PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (B) SCHEDULING AN AUCTION AND SALE HEARING; (C) APPROVING THE MANNER AND FORM OF NOTICES OF THE SALE, AUCTION, AND SALE HEARING; AND (D) GRANTING RELATED RELIEF; AND (II) AN ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL INTERESTS; (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) GRANTING RELATED RELIEF**

Eat Here Brands, LLC, Babalu Atlanta #1 LLC, Babalu Atlanta #2 LLC, Babalu Knoxville #1 LLC, Babalu Memphis #1 LLC, Babalu Memphis #2 LLC, Babalu, LLC, and Babalu Birmingham #1 LLC (collectively, the "Debtors") hereby move this Court (the "Motion"), pursuant to Sections 105, 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004, 6006, 9006, and 9008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of: (i) an order (a) authorizing and approving bid procedures for the sale of substantially all of the Debtors' assets; (b) approving the form of the APA (as defined below), (c) scheduling an Auction and Sale Hearing (each as defined below); (d) approving the manner and form of notices of Sale, the Auction, and Sale

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  Eat Here Brands, LLC (9694); Babalu Atlanta #1 LLC (4025); Babalu Atlanta #2 LLC (5240); Babalu Knoxville #1 LLC (3163); Babalu Memphis #1 LLC (9320); Babalu Memphis #2 LLC (4558); Babalu, LLC (7673); and Babalu Birmingham #1 LLC (1892).  The Debtors' mailing address is 9755 Dogwood Road, Suite 200, Roswell, Georgia 30075.

Hearing; and (e) granting related relief; and (ii) an order (a) approving the sale of substantially all of the Debtors' assets free and clear of all liens, claims, interests, and encumbrances; (b) authorizing the assumption and assignment of certain executory contracts and unexpired leases; and (c) granting related relief.   In support of this Motion, the Debtors respectfully state as follows:

<b><u>SUMMARY OF RELIEF REQUESTED</u></b>

1.     The Debtors have negotiated a proposed transaction with Balu Holdings, LLC (the "<u>Stalking Horse Bidder</u>; together with the Debtors, the "<u>Parties</u>").   The Stalking Horse Bidder has agreed to purchase substantially all of the Debtors' assets (the "<u>Acquired Assets</u>"), subject to Court approval, pursuant to the Asset Purchase Agreement, dated September 9, 2019, by and among the Parties (the "<u>APA</u>").   A true and correct copy of the APA is attached to this Motion as **Exhibit A**.  The APA transaction is subject to higher and better offers.  In furtherance of the Debtors' efforts to maximize the value of their respective bankruptcy estates, they intend to conduct an Auction for Qualified Bidders (as defined below) to seek other bids to purchase the Acquired Assets.  To further this process, the Debtors seek entry of two orders:

First, the "<u>Bid Procedures Order</u>" attached to this Motion as **Exhibit B**:

(i)      authorizing and approving bid procedures (the "<u>Bid Procedures</u>") for the sale of the Acquired Assets;

(ii)     approving the form of the APA;

(iii)    approving procedures for the assumption and assignment of certain executory contracts and unexpired leases;

(iii)    scheduling an auction (the "<u>Auction</u>") and a hearing to approve the proposed sale of Acquired Assets (the "<u>Sale Hearing</u>");

2

(iv)      approving the manner and form of Notice of the Auction and Sale Hearing for the sale of substantially all of the Debtors' assets free and clear of all liens, claims, interest, and encumbrances, substantially in the form attached to this Motion as **Exhibit C** (the "Sale Notice"); and

(v)      granting related relief.

Second, the "Sale Order" in a form substantially similar to the proposed order to be filed[2] (as may be modified by a party other than the Stalking Horse Bidder if such other party is the Successful Bidder (as defined below)):

(i)      approving and authorizing the sale of the Acquired Assets free and clear of all liens, claims, interests, and encumbrances, except to the extent set forth in the APA or the Successful Bidder's asset purchase agreement;

(ii)      authorizing the assumption and assignment of certain executory contracts and/or unexpired leases, and granting related relief.

## BACKGROUND

A.    **General Background**

2.      On July 30, 2019 (the "Petition Date"), the Debtors each commenced voluntary cases (the "Bankruptcy Cases") under Chapter 11 of the Bankruptcy Code.

3.      The Debtors have continued in possession of their properties and have continued to operate and manage their respective businesses as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

4.      Additional information about the Debtors' businesses and the events leading up to the commencement of the Bankruptcy Cases can be found in the Declaration of Ned Lidvall,

---

[2]      The Debtors will file the form of the proposed Sale Order within thirty (30) days after the filing of this Motion.

13889329v4

Chief Executive Officer of the Debtors, in Support of Chapter 11 Petitions and First-Day Orders [Docket No. 5] (the "Lidvall Declaration"), which is incorporated herein by reference. The Debtors may file further declaration(s) in support of the Bid Procedures and approval of the proposed sale as they deem necessary under the circumstances.

5.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The venue of these Bankruptcy Cases and this Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      On August 20, 2019, the Court entered a Final DIP Order in these Bankruptcy Cases [Docket No. 69] as amended by that certain Amended Final DIP Order [Docket No. 103] (the "Final DIP Order"), which, among other things, authorized the Debtors to use cash collateral and the proceeds of the Debtors' DIP loan from Origin Bank pursuant to a budget, which was attached to the DIP Financing Motion [Docket No. 16] as Exhibit C (the "Budget").

7.      The Final DIP Order provides that it shall be a default under the DIP Order if the Debtors fail to: (i)  file a bidding procedures motion with or without a stalking horse on or before September 10, 2019; (ii) obtain entry of a bidding procedures order within twenty-four (24) days of Debtors' filing of the bidding procedures motion; (iii) obtain entry of an order approving the sale of all or substantially all of the Debtors' assets on or before October 18, 2019, or (iv) close a sale of all or substantially all of the Debtors' assets on or before October 27, 2019.

8.      At the first day hearing in these Bankruptcy Cases, in light of the sale milestones set forth in the Final DIP, the Court provided the Debtors with September 26, 2019 and October 18, 2019, as placeholders for hearings to consider bidding procedures related to any proposed

13889329v4

sale of all or substantially all of their assets and a hearing to ultimately approve a proposed sale of the Debtors' assets.

9.      If the Stalking Horse Bidder is the Successful Bidder (as defined below) and closes on the acquisition of the Acquired Assets, it is contemplated that the Stalking Horse Bidder will hire substantially all of the Debtors' current employees to continue to operate the Debtors' businesses.

**B.      The Stalking Horse Bidder's APA**

10.      The following is a summary of the pertinent terms of the APA, which the Debtors will make available to third-party bidders:[3]

> **Acquired Assets**: Section 1.1 of the APA describes the Acquired Assets, which are comprised of substantially all of the Debtors' assets. The Acquired Assets do not include the Excluded Assets, which are described in Section 1.2 of the APA.  Excluded Assets include all claims and causes of actions of the Debtors against third parties, including those arising under Sections 544, 547, 548, 549, and 550 the Bankruptcy Code. Section 1.3 includes the assignment of certain executory contracts and unexpired leases, which will be identified in Schedules 1.1(f) and 1.3(b) of the APA, together with any applicable cure costs.

> **Assumed Liabilities**: The Stalking Horse Bidder will not assume or have any responsibility with respect to any liabilities of the Debtors or the Debtors' customers, other than the Assumed Liabilities, which will be described in Section 2.3of the APA.

> **Purchase Price**: $3,620,000 consisting of the cash component set forth in the APA *plus* the Assumed Liabilities, less cure costs up to the sum of $100,000.

> **Termination**: The APA may be terminated:

> > (i)      by mutual written agreement of the Parties prior to the Closing;

---

3      The following summary is qualified in its entirety by reference to the provisions of the APA.  In the event of any inconsistencies between the provisions of the APA and the summary in this Motion, the terms of the APA, as applicable, shall control.  Unless otherwise defined in the summary set forth in the accompanying text, capitalized terms shall have the meanings assigned to such terms in the APA, as applicable.

13889329v4

(ii)     by the Debtors if there has been a material breach by the Stalking Horse Bidder, which breach the Stalking Horse Bidder has failed to cure within thirty (30) days following its receipt of written notice thereof from Debtors and which breach would cause the condition set forth in Section 4.1(a) of the APA not to be satisfied;

(iii)    by the Debtors upon delivery of written notice to the Stalking Horse Bidder, if any condition precedent of the Debtors specified in Section 4.1 shall not have been satisfied or waived and shall have become impossible to satisfy, unless the failure of such condition to have been satisfied was caused primarily by a material breach by the Debtors;

(iv)    by the Debtors if the Court enters the Sale Order approving a sale to another Qualified Bidder (as defined in the Bid Procedures) or confirming any Chapter 11 Plan involving any other Alternative Transaction;

(v)     by the Debtors upon delivery of written notice to the Stalking Horse Bidder, if the Closing shall not have occurred on or before 5:00 p.m. (Central) on October 27, 2019, but only to the extent the Closing has not occurred as of October 27, 2019 for reasons other than the Debtors' failure to meet their obligations under the APA;

(vi)    by the Debtors if the Bankruptcy Cases are dismissed or converted to cases under Chapter 7 of the Bankruptcy Code, or if any trustee is appointed in the Bankruptcy Cases;

(vii)   by the Stalking Horse Bidder if the Bid Procedures Order is not entered by the Court by September 29, 2019;

(viii)  by the Stalking Horse Bidder if the Sale is not entered by the Court by October 18, 2019;

(ix)    by the Stalking Horse Bidder if there has been a material breach by a Debtor, which breach such Debtor has failed to cure within thirty (30) days following its receipt of written notice thereof from the Stalking Horse Bidder and which breach would cause the condition set forth in Section 4.2(a) of the APA not to be satisfied;

(x)     by the Stalking Horse Bidder if any condition precedent of Purchaser specified in Section 4.2 of the APA shall not have been satisfied or waived and shall have become impossible to satisfy, unless the failure of such condition to have been satisfied was caused primarily by a material breach by the Stalking Horse Bidder;

(xi)    by the Stalking Horse Bidder if the Court enters the Sale Order approving a sale to another Qualified Bidder or confirming any Chapter 11 Plan involving any other Alternative Transaction;

(xii)   by the Stalking Horse Bidder if the Closing shall not have occurred on or before 5:00 p.m. (Central) on October 27, 2019, but only to the extent the Closing has not occurred as of October 27, 2019 for reasons other than the Stalking Horse Bidder's failure to meet its obligations under the APA;

(xiii)  by the Stalking Horse Bidder if the Bankruptcy Cases are dismissed or converted to cases under Chapter 7 of the Bankruptcy Code, or if any trustee is appointed in the Bankruptcy Cases;

(xiv)   by the Stalking Horse Bidder, if for any reason the Debtors are unable, or fail, to assume and assign to the Stalking Horse Bidder at the Closing any of the Restaurant Leases (as such term is defined in the APA) except to the extent (x) the Stalking horse Bidder elects in accordance with the APA that a Restaurant Lease will not constitute a Purchased Contract (as such term is defined in the APA) or (y) the Restaurant to which the Restaurant Lease relates is excluded from the Contemplated Transactions (as such term is defined in the APA) in accordance with Section 11.4 of the APA; or

(xv)    by the Stalking Horse Bidder, if the Debtors have delivered a Casualty Notice (as such term is defined in the APA) to the Stalking Horse Bidder in respect of a Material Casualty (as such term is defined in the APA); provided that, the Stalking Horse Bidder delivers such written notice no later than five (5) days after the Debtors delivered such Casualty Notice.

**Good Faith Deposit**: The Stalking Horse Bidder has provided the Debtors with a good faith deposit in the amount of $362,000.

**Exclusivity Period**: None.

**Expense Reimbursement**: A contingent expense reimbursement (the "Expense Reimbursement") of all actual, necessary, and documented out of pocket expenses not to exceed $25,000 to be paid to the Stalking Horse Bidder in the event that the Stalking Horse Bidder terminates the APA under Section 14.4(e) of the APA and the Debtors fail to consummate an Alternative Transaction (as such term is defined in the APA). *See* Sections 12.5 and 14.4(e) of APA.

**Break-Up Fee:** A break-up fee of $50,000 in the event that the Debtors close an Alternative Transaction (as such term is defined in the APA) (the "Break-Up Fee"). *See* Section 12.1 through 12.4 of APA.

7

**Business Information**: The Debtors have made or will make available to the Stalking Horse Bidder all books, records, correspondence, customer lists, and technical and financial information requested by the Stalking Horse Bidder and relating to the Acquired Assets as of the date of the Closing.

**No Successor Liability**: Under the APA, the Stalking Horse Bidder will acquire all of the Debtors' right, title and interest in and to all of the Acquired Assets, free and clear of any liens, claims, interests, or encumbrances.

**Sale of Avoidance Actions**: Avoidance actions are excluded from the Acquired Assets.

**Sale Free and Clear of Unexpired Leases**: None.

**Relief from Bankruptcy Rule 6004(h)**: Under the APA, the Sale Order shall provide for the waiver of the fourteen (14) day stay period under Rule 6004(h) of the Bankruptcy Rules.

**Provisions to be Highlighted Pursuant to General Order No. 26-2019**

11.     General Order No. 26-2019 (the "Court Procedures Order") promulgates certain procedures for use in complex chapter 11 cases that requires that sale motions must highlight the following provisions (the "Highlighted Provisions"), identify the location of any such provision in the proposed order, and justify such inclusion:

a.      Sale to Insider. Section H.3.i of the Court Procedures Order requires disclosure of provisions in which the proposed sale is to an insider.  This Stalking Horse Bidder is not an insider, so this provision is inapplicable.

b.      Agreements with Management. Section H.3.ii of the Court Procedures Order requires the disclosure of any (1) material terms of any such agreements with management or key employees regarding future compensation and (2) what measures have been taken to ensure the fairness of the sale in light of any such agreements.  The Stalking Horse Bidder may have general discussions with current management about potential employment post-closing and/or bonuses to be paid during the cases should the Stalking Horse Bidder be the Successful Purchaser.  Any other Qualified Bidder shall be permitted the opportunity to have similar discussions with current management.

c.      Releases. Section H.3.iii of the Court Procedures Order requires the disclosure of any provisions pursuant to which an entity is being released or claims are being waived or otherwise satisfied.  No releases are contemplated under the APA.

d.      Private Sale/No Competitive Bidding. Section H.3.iv of the Court Procedures Order requires disclosure of whether an auction is contemplated and highlight

13889329v4

whether the Debtors have agreed not to solicit competitive offers or otherwise limit the shopping of the assets to be sold. The Debtors are seeking approval of Bid Procedures and to continue to market their assets on a post-petition basis, so this provision is inapplicable.

　　　　e.　　__Closing and Other Deadlines__. Section H.3.v. of the Court Procedures Order requires the disclosure of any deadlines for the closing of the sale or deadlines that are conditions to closing. Currently, the Final DIP Order in these Bankruptcy Cases contemplates that it shall be an event of default under the Final DIP Order unless the Debtors: (i) file a bidding procedures motion with or without a stalking horse on or before September 10, 2019; (ii) obtain entry of a bidding procedures order within twenty-four (24) days of Debtors' filing of the bidding procedures motion; (iii) obtain entry of an order approving the sale of all or substantially all of the Debtors' assets on or before October 18, 2019, or (iv) close a sale of all or substantially all of the Debtors' assets on or before October 27, 2019.

　　　　f.　　__Good Faith Deposit__. Section H.3.vi of the Court Procedures Order requires the disclosure of a good faith deposit and the conditions for forfeiting the deposit. As set forth above, the Stalking Horse Bidder has provided the Debtors with a good faith deposit in the amount of $362,000. The Bid Procedures contemplate any proposed alternative bidder must provide a deposit equal to at least ten percent (10%) of the cash component of the purchase price of such bid.

　　　　g.　　__Interim Arrangements with Proposed Buyer__. Section H.3.vii of the Court Procedures Order requires the disclosure of any interim arrangement with the proposed buyer. No interim arrangements prior to the closing are contemplated. Upon closing, the parties may execute one or more management agreements to address any interim arrangements necessary pending the transfer of liquor licenses to the Stalking Horse Bidder.

12.　　The Debtors respectfully submit that the inclusion of the Highlighted Provisions is required and appropriate under the circumstances.

## PREPETITION MARKETING PROCESS

13.　　Beginning in July 2019, Debtors' management with the assistance of GGG Partners, LLC ("GGG"), Debtors' financial advisor, and the Debtors' other professional advisors, commenced marketing efforts to locate a potential purchaser for the Debtors assets. The Debtors attempted to find a buyer or financial partner to provide the Debtors with sufficient resources to continue their businesses and restructuring strategy.

13889329v4

14.     As part of this pre-petition (mostly performed by company management) and post-petition marketing process, GGG assisted the Debtors in: (a) preparing and negotiating confidentiality agreements for prospective purchasers; (b) preparing detailed information about the Debtors' businesses, operations and financial condition; (c) identifying and contacting potential purchasers; (d) establishing a data room for due diligence to be conducted by prospective purchasers; (e) drafting a "teaser" describing the transaction; (f) evaluating proposals from prospective purchasers; and (g) negotiating a stalking horse offer.

15.     During the marketing period, GGG and the Debtors contacted over 55 potential investors/buyers.  Of those contacted, 21 parties executed confidentiality agreements and were given operational, organizational, and financial information on the Debtors. Of those parties executing confidentiality agreements, many made visits to the Debtors' facilities.  The Debtors received seven letters of intent from parties interested in pursuing a deal with the Debtors.

16.     No other offer or letter of intent received to date would have provided more certainty of closing and value to the Debtors or their creditors than the APA with the Stalking Horse Bidder.  Should the Court approve Bid Procedures, the bid of the Staking Horse Bidder will serve as the floor for all other interested parties for the Acquired Assets.

## ADDITIONAL POST-PETITION MARKETING

17.     After the anticipated approval of the Bid Procedures, GGG and the Debtors will continue to market the Debtors assets to qualify any additional buyers and sell the Acquired Assets to the highest and best bidder through a court-approved process as set forth in the Bid Procedures.

18.     The Debtors will update a transaction introduction teaser for distribution to potential purchasers, which summary will provide a brief overview of the Debtors and their

13889329v4

operations.  This teaser will be sent to parties that the Debtors believe might have a potential interest in the Acquired Assets and the financial wherewithal to consummate the transaction (including those who the Debtors have already contacted).    A form of nondisclosure agreement ("NDA") will accompany the teaser.  The NDA will be in a form materially similar to the one executed by the Stalking Horse Bidder.  For parties executing an NDA, the Debtors will provide access to an electronic data room website (the "Data Room"), which contains financial information as well as leases, contracts, and other documents pertaining to the Debtors' operations and financial performance.  All of the information may be accessed by potential bidders (once such parties execute the NDA) via a secure invitation to the Data Room.

19.    The Stalking Horse Bidder has provided the basis for soliciting opening bids for a possible auction of the Acquired Assets.  Pursuant to the Bid Procedures, if the Debtors receive one or more bids from a Qualified Bidder (as defined in the Bid Procedures) an Auction will be commenced on a date and time set by the Court.  All bids for the Acquired Assets and at the Auction must comply with the Bid Procedures approved by the Court.  In the event of an Auction, the Debtors intend to enter into a definitive asset purchase agreement with the Successful Bidder.

20.    The Debtors will, as necessary, supply further testimony and evidence at the second hearing on this Motion (the "Sale Hearing") outlining the steps they took to solicit offers and ultimately consummate a deal with the Successful Bidder.

**RELIEF REQUESTED**

**A.    Bid Procedures Order**

21.    By this Motion, the Debtors seek entry of the Bid Procedures Order: (i) approving the Bid Procedures (as set forth below) and establishing procedures for providing notices to

13889329v4

parties to executory contracts and unexpired leases proposed to be assumed and assigned, and an opportunity for such counterparties to object, as set forth in the Bid Procedures; and (ii) scheduling the Auction (if necessary) and the Sale Hearing, and approving the form and manner of notice thereof.

### (i)      The Bid Procedures and Cure Procedures

22.      As described more fully in the Bid Procedures Order and summarized herein, the Debtors seek approval to sell the Acquired Assets to a Qualified Bidder that makes the highest or otherwise best offer for the Acquired Assets, after an additional solicitation period during which information will be provided to any party in interest purchasing the Debtors' assets, subject to appropriate confidentiality agreements.

23.      The Debtors will utilize the services of GGG and their legal counsel to help move forward with the sale process.   As set forth above, GGG will continue its pre-petition and post-petition efforts to market the Debtors' assets for sale to potential buyers and conduct a sale process to aid the Debtors in identifying the highest and best bidder for the Acquired Assets. Third parties engaging in this process will have the opportunity to conduct due diligence on the Debtors and their assets, and any bidder constituting a Qualified Bidder shall be entitled to make a bid at a live auction against the Stalking Horse Bidder for the Debtors' assets.

24.      As described more fully in the Bid Procedures, the Debtors request that competing bids for the Acquired Assets be governed by the following procedures.[4]  The Debtors also request approval of procedures (the "Cure Procedures") for notifying counterparties to executory contracts and unexpired leases of potential Cure Costs (as defined below) with respect

---

[4]      The following description of the Bid Procedures is only a summary of the terms of the Bid Procedures set forth in the Bid Procedures Order. The following summary is qualified in its entirety by reference to the provisions of the Bid Procedures.  In the event of any inconsistencies between the provisions of the Bid Procedures and the terms herein, the terms of the Bid Procedures shall control.

13889329v4

to those executory contracts and unexpired leases that the Debtors may seek to assume and assign under the Successful Bidder's asset purchase agreement.

a. <u>Qualified Bids</u>. The Debtors shall solicit bids through **October 10, 2019** (the "<u>Bid Deadline</u>"). Each competing bidder other than the Stalking Horse Bidder shall, on or before **12:00 p.m. (prevailing Eastern Time) on the Bid Deadline**, deliver to the Debtors as follows (collectively, a "<u>Qualified Bid</u>"):

(i)     a cash deposit (via certified or bank check or wire transfer) of at least ten percent (10%) of the cash component of the purchase price of such bid (the "<u>Deposit</u>");

(ii)    reasonable proof acceptable to the Debtors, in consultation with the official committee of unsecured creditors appointed in these Bankruptcy Cases (the "<u>Committee</u>") and Origin Bank, of the interested party's ability to consummate a purchase of the Acquired Assets and assumption of any liabilities with respect to which such bidder seeks assignment from the Debtors and provide adequate assurance of future performance under all unexpired leases or executory contracts with respect to which such bidder seeks assignment from the Debtors, each on the terms set forth in such party's bid, including evidence of sufficient financing along with any other financial information which a bidder believes substantiates its ability to perform its obligations with regard to its bid (collectively, "<u>Financial Information</u>");

-and-

(iii)   an executed asset purchase agreement, which asset purchase agreement shall (1) specify the amount of cash or other consideration offered by the competing bidder for the Acquired Assets (provided that the cash component of such bid may *not be less than* the sum of $3,720,000 (which is the sum of the cash component of the purchase price in the Stalking Horse Bidder's APA, the Break-Up Fee, and $50,000); (2) not be subject to unperformed due diligence, financing conditions, corporate approval conditions, or regulatory approval conditions, nor provide for any expense reimbursement; (3) constitute an irrevocable offer by such competing bidder to complete its proposed purchase upon the terms set forth therein, and must confirm that it is irrevocable until closing of the sale of the Acquired Assets to the Successful Bidder (as defined below), and provide for an outside date of closing that is on or before October 27, 2019; (4) provide for the purchase of substantially all of the Acquired Assets; (5) be accompanied by a marked-up version of the APA that shows all differences between such asset purchase agreement and the APA

13

(which was filed with the Court as **Exhibit A** to the Sale Motion); (6) contain a list of the Debtors' executory contracts and unexpired leases with respect to which the bidder seeks assignment from the Debtors; (7) fully disclose the identity of each entity that will be bidding for the Acquired Assets or otherwise participating in connection with such bid; and (8) indicate whether such competing bidder agrees to act as the Back-Up Bidder (as defined below) in the event that such competing bidder is not the Successful Bidder (as defined below), as well as identify any date past which it would not serve as the Back-Up Bidder.

If the competing bidder is an entity formed for the purpose of a sale transaction, then such entity must provide financial disclosure acceptable to Debtors that demonstrates such competing bidder's financial ability to consummate a competing sale transaction. A competing bidder also must establish that it has the financial ability to consummate its proposed transaction by **no later than October 10, 2019**. In order to participate in the bidding process, receive due diligence materials, and/or otherwise be considered for any purpose hereunder, a competing bidder must first deliver an executed confidentiality agreement in form and substance satisfactory to the Debtors and their counsel, which confidentiality agreement will be made available to, among others, those interested parties that contact Debtors' counsel, provided that, if any competing bidder is or is affiliated with a competitor of the Debtors, the Debtors will not be required to disclose to such competing bidder any trade secrets or proprietary information. If the Debtors determine that a competing bidder does not constitute a Qualified Bidder (as defined below), then such competing bidder's ability to receive due diligence access or additional non-public information shall terminate, except as otherwise agreed by the Debtors.

b.     Credit Bid by Prepetition and DIP Lender. Origin Bank, serves as the Debtors' prepetition secured lender and the Debtors' post-petition secured lender in these Bankruptcy Cases. Origin Bank shall be entitled to credit bid up to the full value of its pre-petition and post-petition secured claims totaling $5,596,700.00 plus any amounts then extended to the Debtors under the DIP loan (which additional amount shall be provided to any Qualified Bidder at the Auction).

c.     Qualified Bidders. Any initial overbid for the Acquired Assets shall be in the amount equal to the sum of $3,720,000. In the event that the Debtors shall reasonably determine that such overbid is a higher and better bid than that set forth in the APA, the Stalking Horse Bidder shall have the right to amend the APA as necessary in its reasonable discretion, as agreed with the Debtors, in order to cause the Stalking Horse Bidder's bid format to be comparable to such higher and better bid (for the avoidance of doubt, the amendment of the APA by the Stalking Horse Bidder will in no event result in the cancellation of the Auction if the Debtors have received at least one (1) other Qualified Bid). Only those persons or entities who have submitted a Qualified Bid in compliance with the Bid Procedures Order shall be

14

a "Qualified Bidder"; *provided, however,* that the Stalking Horse Bidder shall be deemed to be a Qualified Bidder for all purposes under the Bid Procedures.  Each Qualified Bidder shall be invited to attend the Auction at the law office of Debtors' counsel of record, Arnall Golden Gregory LLP, 171 17th Street, N.W., Suite 2100, Atlanta, Georgia 30363-1031, which Auction must be attended in person by the Qualified Bidder or an authorized representative of the Qualified Bidder.

        d.    <u>Identity of Bidders</u>.  In addition to the information required above, each competing bidder other than the Stalking Horse Bidder shall, on or before **October 10, 2019**, provide written identification of the bidder, its principals, and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction and written disclosure of any connections or agreements with the Debtors, the Stalking Horse Bidder, any other known potential bidder, and/or any officer, director, manager, or direct or indirect equity security holder of the Debtors.

        e.    <u>The Auction</u>. The Auction shall commence at **10:00 a.m. (Eastern) on October 16, 2019** at the law office of Debtors' counsel of record, Arnall Golden Gregory LLP, 171 17th Street, N.W., Suite 2100, Atlanta, Georgia 30363-1031.  The Acquired Assets shall be sold free and clear of all liens, claims, interests, and encumbrances to the fullest extent allowed under Section 363(f) of the Bankruptcy Code and applicable law.  The following rules shall govern the Auction:

        i.    At least 24 hours prior to the Auction, the Debtors will notify all Qualified Bidders in writing of the highest and best Qualified Bid, as determined by Debtors, in consultation with the Committee and Origin Bank, which may be the APA (the "<u>Baseline Bid</u>"). Complete copies of all asset purchase agreements, amendments to the APA, and all other bid materials submitted by each other Qualified Bidder will be available to each other Qualified Bidder upon request to Debtors' counsel of record.

        ii.    Only Qualified Bidders may bid at the Auction. If multiple Qualified Bids are received, each Qualified Bidder shall have the right to continue to improve its Qualified Bid at the Auction. Bidding at the Auction shall proceed in increments of at least $25,000 (the "<u>Bidding Increment</u>"), and the Bidding Increment may be increased in the Debtors' discretion.  Only the authorized representatives of each of the Stalking Horse Bidder and any other Qualified Bidder, the Debtors, Origin Bank, the Committee, and United States Trustee shall be permitted to attend the Auction, except as otherwise expressly ordered by the Court.

        iii.    At the conclusion of the Auction, subject to Court approval following the Auction, the highest and best offer shall be selected and announced as the successful bidder by the Debtors (the "<u>Successful Bidder</u>"), and the bid of the bidder that submits the next highest and best bid (designated in accordance with the

13889329v4

Debtors' business judgment), in consultation with the Committee and Origin Bank, shall be selected and announced by the Debtors (the "<u>Back-Up Bid</u>" by the "<u>Back-Up Bidder</u>"); provided, however, that designation of such bidder as the Back-Up Bidder must be consistent with the asset purchase agreement submitted in connection with such bidder's bid.  For the avoidance of doubt, if there are no Qualified Bidders who agree to act as the Back-Up Bidder, then there shall be no Back-Up Bidder.  There will be no further bids or offers considered by the Debtors following the conclusion of the Auction and the announcement of the Successful Bidder and, as applicable, the Back-Up Bidder.

iv.   If the Debtors do not receive at least one Qualified Bid from a Qualified Bidder other than the Stalking Horse Bidder, then (1) no Auction shall be conducted, the Debtors and the Stalking Horse Bidder are authorized to move forward with the transactions contemplated by the APA (subject to the entry of the Sale Order) and the Sale Hearing, the transaction consideration contemplated by the APA will be determinative of the value of the Acquired Assets, and the Court shall not consider any competing or alternative offers or proposals to purchase the Acquired Assets; and (2) the Debtors will file on the docket in the Lead Bankruptcy Case a "Notice of Cancellation of Auction."

v.    The Auction may be adjourned from time to time by the Debtors, provided that, no such adjournment shall affect the rights of the Stalking Horse Bidder under the APA.  Reasonable notice of such adjournment and the time and place for the resumption of the Auction shall be given to the Stalking Horse Bidder, all Qualified Bidders that have submitted a Qualified Bid, and counsel for Origin Bank, counsel for the Committee, and the United States Trustee.

f.    <u>Successful Bidder</u>. The Debtors may base the selection of the Successful Bidder and Back-Up Bidder on the following factors, among others: purchase price, liabilities assumed in the bid (provided that in no event shall the cash component required for a Qualified Bid be reduced as a result of a bidder's proposed assumption of liabilities), retention of the Debtors' employees, the markup of the form of asset purchase agreement submitted with the bid, and the apparent ability of a Qualified Bidder to close the proposed transaction.  The Debtors may (a) reject any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bid Procedures, or the terms and conditions of sale, or (iii) contrary to the best interests of the Debtors, their bankruptcy estates, and their creditors; and/or (b) refuse to consider any bid that fails to comply with the Bid Procedures.  After the determination of the Successful Bidder, the Debtors shall (i) if the Successful Bidder is a bidder other than the Stalking Horse Bidder, promptly execute the asset purchase agreement previously executed and submitted by such Successful Bidder, together with any changes thereto necessitated by the parties' actions at the Auction, or (ii) if the Successful Bidder is the Stalking

Horse Bidder, move forward with the transactions contemplated by the APA.  All rights of the Stalking Horse Bidder, (if any) to object to the Debtors' selection of a Successful Bidder or Back-Up Bidder, or to object to the consummation of the sale transaction represented by either such bid, are preserved and shall be considered by the Court at the Sale Hearing.

g. _Back-Up Bidder_. If the Successful Bidder fails to consummate an approved sale in accordance with the applicable asset purchase agreement or such agreement is terminated (or, in the event that the Stalking Horse Bidder is the Successful Bidder, the Parties fail to consummate the transactions contemplated by the APA or the APA is terminated), (i) the Debtors shall be authorized to deem the Back-Up Bid the Successful Bid, and the Debtors shall be authorized to consummate the sale with the Back-Up Bidder without further order of the Court (or, in the event that the Stalking Horse Bidder is the Back-Up Bidder, move forward with the transaction contemplated by the APA, subject to the APA); provided, however, that if the Stalking Horse Bidder is the Successful Bidder, the Back-Up Bidder shall remain the Back-Up Bidder in accordance with the Back-Up Bidder's asset purchase agreement; and (ii) the Deposit provided by such defaulting bidder shall be forfeited to the Debtors in accordance with the defaulting bidder's asset purchase agreement.  The Debtors specifically reserve the right to seek all appropriate damages or equitable remedies from a defaulting Successful Bidder or Back-Up Bidder.

h. _Modification of Bidding and Auction Procedures_. The Debtors, in their sole discretion, may modify the Bid Procedures with respect to the Bid Deadline, whether a bid that materially complies with the requirements of the Bid Procedures (as determined by the Debtors in the reasonable exercise of their business judgment consistent with their fiduciary duties) is a Qualified Bid, and the time, manner, and place of the Auction; provided, however, that the Bid Procedures may not be otherwise modified except with the express written consent of the Debtors and the Stalking Horse Bidder; provided, further, however, that in no event may the Bid Procedures be modified to reduce the required cash component of a Qualified Bid. All rights of the Stalking Horse Bidder in respect of any modification of the Bid Procedures by the Debtors are preserved.  The Debtors may make such modification to the Bidding Procedures as are necessary and not inconsistent with the Bid Procedures Order.

i. _Contract Cure Procedures_.   To the extent a Qualified Bidder seeks approval in the Sale Order (as defined in the Motion) of the assumption and assignment of executory contracts and/or unexpired leases, the following procedures (the "Cure Procedures") shall apply for notifying counterparties to executory contracts and unexpired leases of potential Cure Amounts (as defined below).

i. Within two days (2) days after the Bid Deadline the Debtors will file a notice of potential assumption, assignment, and/or transfer of executory contracts and unexpired leases identified by each Qualified Bidder (the "Designated Executory Contracts"), substantially in the form attached to this Motion as **Exhibit D** (the "Notice of Assumption and Assignment"), and serve such notice on all non-debtor parties to the Designated Executory Contracts (the "Contract Notice Parties").  For avoidance of doubt,

13889329v4

the Debtors shall file a Notice of Assumption related to the APA within two days (2) of the entry of the Bid Procedures Order, and serve such notice on all of the Contract Notice Parties.

ii.     The Notice of Assumption and Assignment shall identify the calculation of the cure amounts, if any, that the Debtors believe must be paid to cure all defaults outstanding under each of the Designated Executory Contracts (the "Cure Costs") as of such date. The Notice of Assumption and Assignment shall also contain information regarding how a non-debtor party to a Designated Executory Contract may obtain adequate assurance of future performance information from the applicable Qualified Bidder (the "Adequate Assurance Information"). The Notice of Assumption and Assignment shall provide that a non-debtor party to a Designated Executory Contract may object to the Cure Costs, the Adequate Assurance Information or the assumption and assignment of such executory contract or unexpired lease at the Sale Hearing or at a later hearing, as determined by the Debtors subject to the Court's calendar.

(j)     Break-Up Fee.  In the event the Successful Bidder is deemed to be a person or entity other than the Stalking Horse Bidder, and such Successful Bidder successfully closes on the sale of the Debtors' assets, then, upon such closing, the Debtors shall pay the Break-Up Fee in the amount of $50,000 to the Stalking Horse Bidder.

**(ii)     Approval of the APA**

25.     The Debtors further seek approval of the APA and approval for the Debtors to assume the APA, subject to the Bidding Procedures and auction process.  As set forth above, the APA provides the framework for consummating the transactions negotiated between the Debtors and the Stalking Horse Bidder.

26.     The DIP Loan procured by the Debtors matures on October 27, 2019. The timeline provided in this Motion contemplates a continued marketing and sale process, an opportunity for third parties to conduct due diligence on the Debtors' assets, an auction and subsequent sale all within this period and prior to the maturity of the DIP Loan.  If the DIP Loan were to mature before the closing of the sale, the Debtors would deplete their funds and may be unable to operate, including make payments to their employees, vendors, and their other

creditors.  As a result, the Debtors may experience a cessation of business, destroying all going concern value and seriously harming the Debtors and their respective bankruptcy estates.

27.    Given the Debtors marketing efforts to date, the proposed timeline is sufficient to permit third parties interested in purchasing the Acquired Assets to conduct due diligence and tender a bid.   Interested parties will have sufficient notice of the proposed sale and an opportunity to consider and digest the terms of the APA to determine whether tendering a bid is in their best interests, thereby maximizing the likelihood of competitive bidding under the circumstances.   In light of the Debtors' limited resources, the proposed timeline sets out a framework that will maximize the value of the Debtors' with minimal cost, which is in the best interests of the Debtors and their bankruptcy estates.

**(iii)    Notice Related to Proposed Sale**

28.    *Notice of Bid Procedures Hearing*.   On the date that this Motion is filed, the Debtors propose to serve this Motion and all exhibits thereto, including the APA, and a copy of the proposed Bid Procedures Order, by first-class mail, postage prepaid, upon the following parties: (i) all parties identified on the Master Service List in these Bankruptcy Cases, and (ii) via electronic mail[5] on all persons or entities known or reasonably believed to have an interest in purchasing the Acquired Assets.   The Debtors also propose to serve any Order and Notice or Notice of Hearing related to this Motion upon the following parties: (i) the entire creditor matrix in each of these Bankruptcy Cases and (ii) via electronic mail on all persons or entities known or reasonably believed to have an interest in purchasing the Acquired Assets.

29.    *Notice of Bid Procedures Order and Bidding Procedures, Auction, and Sale Hearing*.   The Debtors propose to file the Sale Notice substantially in the form attached to

---

[5]    The Debtors contacted parties interested in purchasing the Acquired Assets, including the Stalking Horse Bidder, via electronic mail.

this Motion as **Exhibit C** and serve such notice upon: (i) the entire creditor matrix in each of the Bankruptcy Cases and (ii) via electronic mail on all persons or entities known or reasonably believed to have an interest in purchasing the Acquired Assets. The Debtors also propose to file a Notice of Assumption related to the Designated Executory Contracts in the APA within two days (2) of the entry of the Bid Procedures Order, and serve such notice on all of the Contract Notice Parties.

30.     *Post-Auction Notice.*  As soon as possible after the conclusion of the Auction, the Debtors shall file, but not serve, a notice identifying the highest and best bid selected and announced by the Debtors as the Successful Bidder, and the bid of the Back-Up Bidder. In the event that the Successful Bidder identifies any additional executory contracts or unexpired leases that it did not previously designate as Designated Executory Contracts, the Debtors shall file a Notice of Assumption and Assignment identifying such additional agreements, and serve such notice on all of the Contract Notice Parties for those agreements.

31.     *Notice of Cure Related to Designated Contracts by Qualified Bidders Other than the Staking Horse Bidder.*  Within two days (2) days after the Bid Deadline the Debtors propose to file a Notice of Assumption and Assignment substantially in the form attached to this Motion as **Exhibit D** specifying the Designated Executory Contracts identified by each Qualified Bidder, and serve such notice on all of the Contract Notice Parties.

### B.     Sale Order

32.     The Debtors request that this Court set the Sale Hearing on or about October 18, 2019. At the Sale Hearing, pending the outcome of the Auction and as set forth in the Bid Procedures, the Debtors intend to seek entry of a Sale Order (a) approving the sale to the Successful Bidder, free and clear of all liens, claims, interests, and encumbrances

(collectively, "<u>Interests</u>"), (b) authorizing the assumption and assignment of the Designated Executory Contracts identified by the Successful Bidder; and (c) authorizing the Debtors to pay Origin Bank at closing: (i) the amount of sales proceeds necessary to repay Origin Bank's post-petition DIP loan in full and (ii) not less than fifty percent (50%) of all excess sales proceeds (after considering all then budgeted administrative expenses) toward satisfaction of the Pre-Petition Obligations (as defined in the Final DIP Order), provided that, (a) the Challenge Period (as defined in the Final DIP Order) shall have expired on or before the closing of the Sale and (b) no party with standing has filed a Challenge Action (as defined in the Final DIP Order) prior to the expiration of the Challenge Period.

## BASIS FOR RELIEF REQUESTED

33.     The business judgment rule "operates as a presumption 'that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest.'"  *Continuing Creditors' Comm. of Star Telecomms., Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 462 (D. Del. 2004) (quoting *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988)); *see also In re Diplomat Constr., Inc.*, 481 B.R. 215, 218-19 (Bankr. N.D. Ga. 2012) (Diehl, J.); *Ad Hoc Comm. of Equity Holders of Tectonic  Network, Inc. v. Wolford*, 554 F. Supp. 2d 538, 555 n.111 (D. Del. 2008); *In re Bal Harbour  Club, Inc.*, 316 F.3d 1192, 1194-95 (11th Cir. 2003); *Int'l Ins. Co. v. Johns*, 874 F.2d 1447, 1458 (11th Cir. 1989).  Thus, this Court should grant the relief requested in this Motion if the Debtors demonstrate a sound business justification in favor of the requested relief.  *See In re Del. Hudson Ry. Co.*, 124 B.R. 169, 179 (Bankr. D. Del. 1991).

34.     The Debtors have determined that a sale of their assets in accordance with the APA after their marketing and sale process will be the most effective way to maximize the value

13889329v4

of the Debtors' bankruptcy estates for the benefit of their creditors in view of the Debtors' pre and post-petition marketing efforts to date and the Debtors' limited resources.  The proposed transaction will also preserve the employment of many the Debtors' employees.   The Debtors believe that the proposed Bid Procedures will bring the highest and best offer for the Debtors' assets under the circumstances.  The Debtors believe that the assumption of the APA, the implementation of the Bid Procedures and the timeline proposed in this Motion will further achieve this goal.  Absent approval of the sale of the Acquired Assets to the highest and best bidder, the Debtors will likely face a piecemeal liquidation and the termination of all of their employees.   As such, the Debtors believe that they have demonstrated a sound business justification for the relief requested in the Motion.

        **A.**     **<u>Bid Procedures</u>**

35.     The Bid Procedures – including the provision of the Break-Up Fee and contingent Expense Reimbursement – are appropriate to generate maximum value for the Debtors' stakeholders.  The Bid Procedures, *inter alia*, (i) will provide opportunity to further market the Debtors' assets and provide potential bidders with sufficient notice and an opportunity to acquire information necessary to submit a timely and informed bid, (ii) are designed to maximize the value received for the Acquired Assets in view of the Debtors' limited resources by providing maximum opportunity to engender a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids, and (iii) will provide the Debtors with the opportunity to consider all competing offers and to select the highest or otherwise best offer for the sale of substantially all of the Debtors' assets.

36.     The proposed Break-Up Fee of $50,000 (which is less than 1.5% of the cash component of the purchase price in the APA) and contingent Expense Reimbursement of

$25,000 (which is only payable in the event that the Debtors materially default and do not close an Alternative Transaction) are necessary to compensate the Stalking Horse Bidder for funds and other resources deployed to conduct due diligence on the Debtors' assets, negotiate the APA with the Debtors, and participate in the sale process.  The due diligence and negotiation performed by the Stalking Horse Bidder have been necessary to providing the market with an indication of the value of the Debtors' assets and has provided a benchmark for third parties to determine whether to submit a bid.  The Stalking Horse Bidder has provided significant benefit to the Debtors' bankruptcy estates and would not have participated in the sale process absent the Break-Up Fee and contingent Expense Reimbursement.  Accordingly, the Debtors respectfully submit that the Break-Up Fee and contingent Expense Reimbursement are warranted and constitute a reasonable exercise of their business judgment.

37.    The Debtors request this Court's approval of the Bid Procedures, including the Break-Up Fee and contingent Expense Reimbursement and the dates established thereby for an Auction and a Sale Hearing (including shortening notice).  Accordingly, the Debtors and all parties-in-interest can be assured that the consideration for the Acquired Assets will be fair and reasonable, and there are sound business reasons to approve the Bid Procedures.

**B.    The Assumption and Assignment of Executory Contracts and Unexpired Leases and the Cure Procedures**

38.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor."  11 U.S.C. § 365(a).  The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.  *See e.g.,* *In re Stable Mews Assoc., Inc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984).   If the debtor's

business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39-40 (3rd. Cir. 1989).

39.     The business judgment test "requires only that the trustee [or debtor-in-possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting *In re Stable Mews Assoc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984)).  Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten this Court's ability to control a case impartially.  *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).  Moreover, pursuant to Section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default.  11 U.S.C. § 365(b)(1).

40.     Once an executory contract is assumed, the trustee or debtor-in-possession may elect to assign such contract.  *See In re Rickel Home Ctr., Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("The Code generally favors free assignability as a means to maximize the value of the debtor's estate."); *see also In re Headquarters Doge, Inc.*, 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of Section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

41.     Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of

13889329v4

future performance is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.*, 103 B. R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when a prospective assignee of a lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

42. Adequate assurance of future performance shall be presented at the Sale Hearing. If necessary, the Debtors will adduce facts at the Sale Hearing to refute any objection, demonstrating the financial wherewithal of the Successful Bidder, and its willingness and ability to perform under any executory contracts and unexpired leases to be assumed and assigned. The Sale Hearing therefore will provide this Court and other interested parties with ample opportunity to evaluate and, if necessary, challenge the ability of any Successful Bidder to provide adequate assurance of future performance under the executory contracts and unexpired leases that the Debtors seeks to assume and assign.

43. Accordingly, the Debtors believe that the procedures proposed in this Motion for executory contracts and unexpired leases being assumed and assigned on the Closing Date are appropriate and reasonably tailored to provide Contract Notice Parties with adequate notice in the form of the Notice of Potential Assignment and Assumption of the proposed assumption

and/or assignment of their applicable executory contract or unexpired lease, as well as proposed Cure Amounts, if applicable.

44.     Furthermore, to the extent that any defaults exist under any executory contract or unexpired lease that is to be assumed and assigned in connection with any sale of the Assets, the Successful Bidder or the Debtors (as applicable under the Successful Bidder's asset purchase agreement) will cure any such default contemporaneously with or as soon as practicable after consummation of an assumption and assignment of such executory contract or unexpired lease.

45.     Accordingly, this Court therefore has a sufficient basis to authorize the Debtors to assume and assign executory contracts and unexpired leases as may be set forth in any Successful Bidder's asset purchase agreement.

     **C.**     **<u>Approval of the Sale</u>**

     **(i)**     **The Sale is an Appropriate Exercise of the Debtors' Business Judgment**

46.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Although Section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, bankruptcy courts have found that a debtor's sale or use of assets outside the ordinary course of business should be approved if the debtor can demonstrate a sound business justification for the proposed transaction.  *See, e.g., In re Eagle Picher Holdings, Inc.*, 2005 Bankr. LEXIS 2894, at ¶ 3 (Bankr. S.D. Ohio 2005); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986); In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983).  Once a debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors

of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re S.N.A. Nut Co.*, 186 B.R. 98 (Bonier. N.D. Ill. 1995); *see also In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992); *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions").

47.     The sale of a debtor's assets is appropriate where there are sound business reasons behind such a determination.  *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *see also Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (Bankr. D. Del. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D.D.C. 1991); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986) (sale of substantially all assets of estate authorized where "a sound business purpose dictates such action").

48.     The Debtors have negotiated the APA with the Stalking Horse Bidder, which is an arm's length third party with a knowledge and understanding of the Acquired Assets and their value.  The Debtors will utilize a period of time during which interested third parties may conduct diligence into the Debtors' assets and submit a competing bid therefor.  If one or more Qualified Bids are received in addition to the APA, the Debtors will hold an open auction and choose which proposal will provide the maximum benefit for the Debtors' creditors.  If the APA is the Successful Bid, it will constitute the highest and best offer for the Debtors' assets attainable.

49.     In addition, all creditors and parties in interest will receive adequate notice of the Bid Procedures and Sale Hearing as set forth above.  Such notice is reasonably calculated to provide timely and adequate notice to the Debtors' major creditor constituencies, those parties

most interested in these Bankruptcy Cases, those parties potentially interested in bidding on the Acquired Assets, and others whose interests are potentially implicated by any proposed sale transaction.

50.     Given the Debtors' financial condition and current circumstances, the Debtors reasonably determined that the most effective way to preserve the value of their assets for the benefit of all of their stakeholders is through sale of the Acquired Assets in accordance with the process and Bid Procedures proposed in this Motion.

### (ii)    Sale Free and Clear of Liens, Claims, Interests, and Encumbrances

51.     Section 363(f) of the Bankruptcy Code permits a debtor to sell assets free and clear of all liens, claims, interests, and encumbrances (with any such liens, claims, interests, and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets).  Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of such interests in property if:

    (a)     applicable non-bankruptcy law permits a sale of such property free and clear of such interest;

    (b)     such entity consents;

    (c)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

    (d)     such interest is in bona fide dispute; or

    (e)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

52.     Because Section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Acquired Assets "free and clear" of all Interests.  *See Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive; holding that the court may approve the sale

"free and clear" provided at least one of the subsections of Bankruptcy Code Section 363(f) is met); *In re Trans World Airlines. Inc.*, No. 01-0056, 2001 WL 1820325, at *3 (Bankr. D. Del. Mar. 27, 2001) ("Bankruptcy courts have long had the authority to authorize the sale of estate assets free and clear even in the absence of § 363(f)."); *Citicorp Homeowners Servs., Inc. v. Elliot*, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988) (stating that Section 363(f) of the Bankruptcy Code is written in the disjunctive; holding that if any of the five conditions of Section 363(f) are met, the trustee has the authority to conduct the sale free and clear of all liens).

53.    One or more of the prongs of Section 363(f) have been satisfied with respect to each of the Acquired Assets.  The Debtors' believe that their senior secured lender, Origin Bank, has consented to the proposed sale provided that the Bid Procedures are followed.  In addition, notice of the Debtors' intent to sell the Acquired Assets to the Successful Bidder free and clear of all Interests have been provided to all of the Debtors' creditors and other interested parties, with ample opportunity to object.  Absent objection, such parties should be deemed to have consented to the sale free and clear of any Interest in the Acquired Assets sold, with such Interests attaching to the proceeds of such sale.  If applicable, the Debtors are prepared to demonstrate at the Sale Hearing that they have satisfied one or more of the prongs of Section 363(f) of the Bankruptcy Code to the extent this Motion draws objection of any interested party.

54.    The Debtors also request that they be authorized to disburse the proceeds of the sale of the Acquired Assets sufficient to repay Origin Bank's post-petition DIP loan in full and not less than fifty percent (50%) of all excess sales proceeds (after considering all then budgeted administrative expenses) toward satisfaction of the Pre-Petition Obligations (as defined in the Final DIP Order), provided that, (a) the Challenge Period (as defined in the Final DIP Order)

shall have expired on or before the closing of the Sale and (b) no party with standing has filed a Challenge Action (as defined in the Final DIP Order) prior to the expiration of the Challenge Period.

> **(iii)     The Successful Bidder Should be Entitled to the Protections of Section 363(m)**

55.     Pursuant to Section 363(m) of the Bankruptcy Code, a good faith buyer is one who purchases assets for value, in good faith, and without notice of adverse claims.  *See In re Abbotts Dairies*, 788 F.2d at 147; *In re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 9 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985). Specifically, Section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] ... does not affect the validity of a sale ... to an entity that purchased ... such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale ... were stayed pending appeal.

11 U.S.C. § 363(m).

56.     Section 363(m) "fosters the 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'"  *In re Chateaugay Corp.*, Case No. 92 CIV. 7054 (PKL), 1993 WL 159969, *3 (S.D.N.Y. May 10, 1993) (quoting *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143 at 147); *see also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith buyers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

13889329v4

57.     The Stalking Horse Bidder is a third party unrelated to the Debtors that has conducted considerable due diligence on the Acquired Assets and negotiated the APA from an arm's length position.  The Stalking Horse Bidder has been represented by third party legal counsel in connection with the negotiations of the APA.  If the Successful Bidder is the Stalking Horse Bidder, the Stalking Horse Bidder will have been selected as the highest and best bid after a sale process market-tested by the Auction.  In such a case, the Debtors respectfully request that the Stalking Horse Bidder be afforded "good faith" buyer status within the meaning of Section 363(m) of the Bankruptcy Code.

58.     If applicable, the Debtors will adduce facts at the Sale Hearing demonstrating that the Successful Bidder for the Acquired Assets had negotiated at arm's length, with all parties represented by their own counsel.  Accordingly, the Sale Order will include a provision that the Successful Bidder for the Acquired Assets is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code.   The Debtors believe that providing any Successful Bidder engaging in a sale transaction with such protection will ensure that the maximum price will be received by the Debtors for the Acquired Assets, and that the closing of any sale will occur promptly.

### D.     Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate

59.     Rule 6004(h) of the Bankruptcy Rules provides that an "order authorizing the use, sale or lease of property . . .  is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Additionally, Rule 6006(d) of the Bankruptcy Rules provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of the 14 days after the entry of the order, unless the court orders otherwise."  The Debtors request that the Bid Procedures Order and the Sale Order be effective

13889329v4

immediately by providing that the 14-day stays applicable under Rules 6004(h) and 6006(d) of the Bankruptcy Rules be waived.

## **NOTICE**

60.     Notice of this Motion has been given to the following parties, or in lieu thereof, to their counsel: (a) the parties identified on the Master Service List in these Bankruptcy Cases as approved by this Court's Order Establishing Notice and Administrative Procedures [Docket No. 33], and (b) via electronic mail on all persons or entities known or reasonably believed to have asserted an interest in purchasing the Acquired Assets.  The Debtors will also serve a Notice of Hearing on this Motion: (i) on the entire creditor matrix in each of the Bankruptcy Cases and (ii) via electronic mail on all persons or entities known or reasonably believed to have an interest in purchasing the Acquired Assets.  In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

## **NO PRIOR REQUEST**

61.     No prior motion for the relief requested in this Motion has been made to this Court or any other court.

13889329v4

WHEREFORE, the Debtors request that this Court: (i) enter the Bid Procedures Order, (ii) approve the form of the Sale Notice and to the extent necessary shorten notice thereto, (iii) approve the form of the Notice of Assumption and Assignment and to the extent necessary shorten notice thereto, (iv) enter the Sale Order (if applicable), and (v) grant the Debtors such other and further relief as the Court may deem just and appropriate.

Respectfully submitted this 10th day of September 2019.

ARNALL GOLDEN GREGORY LLP

/s/ Darryl S. Laddin
Darryl S. Laddin
Georgia Bar No. 460793
Sean C. Kulka
Georgia Bar No. 648919
171 17th Street, N.W., Suite 2100
Atlanta, Georgia 30363-1031
Phone: (404) 873-8500
Fax: (404) 873-8683
Email: darryl.laddin@agg.com
Email: sean.kulka@agg.com

*Attorneys for Debtors and Debtors in Possession*

13889329v1