# **EXHIBIT A**

## **ASSET PURCHASE AGREEMENT**

*Execution Version*

---

## ASSET PURCHASE AGREEMENT

**by and among**

**Balu Holdings, LLC
a Delaware limited liability company,**

**as Purchaser,**

**and**

**Eat Here Brands LLC, a Delaware limited liability company,**

**Babalu Birmingham #1, LLC, an Alabama limited liability company,**

**Babalu Atlanta #1 LLC, a Georgia limited liability company,**

**Babalu Memphis #1, LLC, a Tennessee limited liability company,**

**Babalu Memphis #2 LLC, a Tennessee limited liability company,**

**Babalu Knoxville #1, LLC, a Tennessee limited liability company,**

**and**

**Babalu, LLC, a Mississippi limited liability company,**

**as Sellers**

**September  9 , 2019**

---

## TABLE OF CONTENTS

Section 1 Transfer of Assets ................................................................................................ 1

    Section 1.1 Purchase and Sale of Assets ...................................................................... 1

    Section 1.2 Excluded Assets .......................................................................................... 3

    Section 1.3 Executory Contracts ................................................................................... 4

Section 2 Consideration ....................................................................................................... 4

    Section 2.1 Purchase Price ............................................................................................ 4

    Section 2.2 Disposition of Deposit at Closing, Etc. ...................................................... 5

    Section 2.3 Assumed Liabilities .................................................................................... 5

    Section 2.4 Excluded Liabilities.................................................................................... 5

    Section 2.5 Payment of Cure Costs ............................................................................... 6

    Section 2.6 Transitional Matters ................................................................................... 7

    Section 2.7 Purchase Price Allocation .......................................................................... 8

    Section 2.8 Apportionment ........................................................................................... 8

Section 3 Closing Transactions ........................................................................................... 9

    Section 3.1 Closing........................................................................................................ 9

    Section 3.2 Sellers' Deliveries to Purchaser at Closing ................................................ 9

    Section 3.3 Purchaser's Deliveries to Sellers at Closing.............................................. 10

    Section 3.4 Sales, Use and Other Taxes ....................................................................... 11

    Section 3.5 Possession and Risk of Loss...................................................................... 11

    Section 3.6 Closing Date............................................................................................... 11

Section 4 Conditions Precedent to Closing ........................................................................ 11

    Section 4.1 Conditions to Sellers' Obligations ............................................................ 11

    Section 4.2 Conditions to Purchaser's Obligations....................................................... 12

Section 5 Sellers' Representations and Warranties .......................................................... 12

    Section 5.1 Organization ............................................................................................... 13

Section 5.2 Validity and Enforceability ................................................................................ 13

Section 5.4 Litigation ........................................................................................................... 13

Section 5.6 Title to Assets; Sufficiency of Assets ............................................................... 13

Section 5.7 Employee Matters ............................................................................................. 13

Section 5.11 Due Notice ....................................................................................................... 13

Section 5.14 Broker's or Finder's Fees ............................................................................... 13

Section 6 Purchaser's Warranties and Representations ........................................................ 14

Section 6.1 Organization ...................................................................................................... 14

Section 6.2 Validity and Enforceability ............................................................................... 14

Section 6.3 No Conflict ........................................................................................................ 14

Section 6.4 Financial Resources .......................................................................................... 14

Section 6.5 Broker's or Finder's Fees ................................................................................. 15

Section 7 Computer/POS Systems and Soft Drink Supply Agreements ............................... 15

Section 7.1 Computer/POS Systems .................................................................................... 15

Section 7.2 Soft Drink Supply Agreements ......................................................................... 15

Section 8 Covenants .............................................................................................................. 15

Section 8.1 Liquor License Approvals ................................................................................. 15

Section 8.2 Adequate Assurance Regarding Purchased Contracts ....................................... 16

Section 9 Bankruptcy Court Approvals ................................................................................ 16

Section 9.1 Stalking Horse ................................................................................................... 16

Section 9.2 Auction .............................................................................................................. 16

Section 9.3 Cooperation ....................................................................................................... 17

Section 10 Commercially Reasonable Efforts ...................................................................... 18

Section 10.1 Commercially Reasonable Efforts ................................................................... 18

Section 10.2 Use of Name .................................................................................................... 18

Section 11 Conduct Pending Closing ................................................................................... 18

Section 11.1 Ordinary Course of Business ................................................................ 18

Section 11.2 Event Notification ................................................................................. 19

Section 11.3 Public Announcement ........................................................................... 19

Section 12 Break Up Fee ................................................................................................... 19

Section 12.1 Break-Up Fee ........................................................................................ 19

Section 12.2 Payment of Break-Up Fee .................................................................... 20

Section 12.3 Survival of Break-Up Fee ..................................................................... 20

Section 12.4 Alternative Transaction ........................................................................ 20

Section 13 Employee Matters ........................................................................................... 20

Section 13.1 Employees ............................................................................................. 20

Section 13.2 Employee Payroll Prior to Closing ...................................................... 20

Section 13.3 Employee Benefits Post-Closing .......................................................... 20

Section 13.4 WARN Act ............................................................................................. 21

Section 14 Termination ...................................................................................................... 21

Section 14.1 Termination by Mutual Consent ........................................................... 21

Section 14.2 Termination by Either Purchaser or Sellers ......................................... 21

Section 14.3 Termination by Sellers .......................................................................... 21

Section 14.4 Termination by Purchaser ..................................................................... 21

Section 14.5 Effect of Termination ............................................................................ 22

Section 14.6 Notification of Certain Events .............................................................. 23

Section 15 Post-Closing Matters ...................................................................................... 23

Section 15.1 Further Conveyances and Assumptions ................................................ 23

Section 15.2 Reasonable Access to Records and Certain Personnel ......................... 23

Section 15.3 Non-Competition .................................................................................. 24

Section 16 Miscellaneous .................................................................................................. 24

Section 16.1 Attorneys' Fees ..................................................................................... 24

**Section 16.2 Notices** ................................................................................................................ 24

**Section 16.3 Entire Agreement** ................................................................................................ 25

**Section 16.4 Modification** ......................................................................................................... 25

**Section 16.5 Severability** .......................................................................................................... 25

**Section 16.6 Captions** ............................................................................................................... 25

**Section 16.7 Waiver** .................................................................................................................. 25

**Section 16.8 Payment of Fees and Expenses** ........................................................................... 25

**Section 16.9 Survival** ................................................................................................................ 25

**Section 16.10 Assignments** ....................................................................................................... 25

**Section 16.11 Binding Effect** .................................................................................................... 25

**Section 16.12 Applicable Law** .................................................................................................. 25

**Section 16.13 Construction** ....................................................................................................... 26

**Section 16.14 Consent To Jurisdiction** .................................................................................... 26

**Section 16.15 Counterparts** ...................................................................................................... 26

**Section 16.16 Non-Recourse** .................................................................................................... 26

**Section 16.17 Time is of the Essence** ....................................................................................... 26

**Section 16.18 Interpretation and Rules of Construction** ......................................................... 26

**Section 16.19 Third Party Beneficiaries** ................................................................................. 27

**Section 17 Definitions** ............................................................................................................... 27

**List of Exhibits**

| | |
|---|---|
| <u>Exhibit A</u> | Form of Management Agreement |
| <u>Exhibit B</u> | Form of Restrictive Covenant Agreement |

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "*Agreement*") is made and entered into as of September 9, 2019 (the "*Effective Date*") by and among Eat Here Brands LLC, a Delaware limited liability company, Babalu Birmingham #1, LLC, an Alabama limited liability company, Babalu Atlanta #1 LLC, a Georgia limited liability company, Babalu Memphis #1, LLC, a Tennessee limited liability company, Babalu Memphis #2 LLC, a Tennessee limited liability company, Babalu Knoxville #1, LLC, a Tennessee limited liability company, and Babalu, LLC, a Mississippi limited liability company (each of the foregoing a "*Seller*" and collectively, "*Sellers*") and Balu Holdings, LLC, a Delaware limited liability company (the "*Purchaser*"). Sellers and Purchaser are sometimes collectively referred to as the "*Parties*."

### PRELIMINARY STATEMENTS

A.     Sellers are engaged in the business of owning and operating six restaurants in four states (such restaurants located in such states, the "*Restaurants*" and such business as conducted in such states, the "*Business*").

B.     Each of Sellers has filed Petitions initiating bankruptcy cases which are being jointly administered under Case No. 19-61688-wlh (the "*Chapter 11 Cases*") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. Sections 101 *et seq.* (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division (the "*Bankruptcy Court*").

C.     On the terms and conditions of this Agreement, and pursuant to Sections 363 and 365 of the Bankruptcy Code, Sellers wish to sell to Purchaser, and Purchaser wishes to purchase from Sellers, certain of the assets and properties of Sellers relating to the Business, and the Parties further wish for Sellers to assume and assign to Purchaser certain executory contracts and unexpired leases pursuant to the terms hereof, all in the manner and subject to the terms and conditions set forth herein and in accordance with Sections 363 and 365 of the Bankruptcy Code (such transactions, the "*Contemplated Transactions*").

### AGREEMENT

In consideration of their respective covenants set forth herein, the Parties, intending to be legally bound, hereby agree as follows:

1.     <u>Transfer of Assets</u>.

1.1     <u>Purchase and Sale of Assets</u>. On the Closing Date and on the terms and conditions hereinafter set forth in this Agreement and pursuant to sections 363 and 365 of the Bankruptcy Code and the Sale Order, Sellers shall sell, assign, transfer, convey and deliver to Purchaser, and Purchaser shall purchase, acquire, accept and receive from Sellers, free and clear of all Encumbrances to the extent provided in the Sale Order, all of each Seller's respective right, title and interest as of the Closing Date in and to the following assets and properties used primarily by Sellers in connection with the operation of the Acquired Restaurants, other than any Excluded Assets (such assets and properties described below, other than the Excluded Assets, are collectively referred to herein as the "*Purchased Assets*"):

(a)     all Furniture and Equipment;

(b)     all Inventory that is located at (or in transit to) any of the Acquired Restaurants as of the Closing Date, other than the Liquor Inventory in jurisdictions where the Legal Requirements do not permit Purchaser to take title to liquor inventories in general or do not permit

1

Purchaser to take title to liquor inventories until Purchaser obtains the requisite Liquor License Approvals from the relevant Governmental Body; provided, however, Sellers shall transfer, assign, convey and deliver to Purchaser such the Liquor Inventory in each instance upon issuance of the relevant Liquor License Approval or other authorization from the relevant Governmental Body (whichever occurs first), and all rights of Sellers to take delivery of any the Liquor Inventory ordered by Sellers before the Closing Date for delivery to any of the Acquired Restaurants, which the Liquor Inventory has not been delivered as of the Closing Date;

(c)    all Restaurant Petty Cash;

(d)    all Large Party Deposits identified on Schedule 1.1(d) hereto;

(e)    all Intangible Property Assets, including, but not limited to, those identified on Schedule 1.1(e) hereto;

(f)    any interest of Sellers under the Restaurant Leases and the Other Contracts (i) that are described on Schedule 1.1(f) hereto, (ii) for which Purchaser has paid the Cure Costs in accordance with Section 2.5, (iii) that are unexpired as of the Closing Date and (iv) that have not been rejected (or are the subject of a notice of rejection or a pending rejection motion) by any Seller (collectively, the "**Purchased Contracts**"), including, without limitation, credits, deposits and prepaid amounts of Sellers with respect to the Purchased Contracts as of the Closing Date subject to the provisions of Section 2.8 hereof;

(g)    to the extent transferable and assignable, all of Sellers' interest in those Business Permits and all Liquor Licenses held by Sellers that are described on Schedule 1.1(g) hereto, in each case to the extent transferable, other than alcohol Business Permits (including Liquor Licenses) in jurisdictions where Legal Requirements not permit Purchaser to take title to such Business Permits until it obtains the requisite approvals from the pertinent Governmental Body; Sellers shall transfer, assign convey and deliver to Purchaser such Business Permits in each instance only upon issuance of the requisite approvals from the relevant Governmental Body;

(h)    all Receivables;

(i)    all books, records, files and papers of Sellers relating to the Business or the Purchased Assets, copies of which may be retained by Sellers, including equipment logs, operating guides and manuals, creative materials, advertising materials, promotional materials, studies, reports, correspondence, financial and accounting records, Tax records and other similar documents and records (all in the state in which such records and information currently exist) and all computers and other storage devices of the Sellers, wherever located, upon which such information resides (collectively, "**Documents**") provided, however, for the avoidance of all doubt, the following items shall not be deemed "Documents," but rather as Excluded Assets for all purposes hereof: (x) any such records that are prohibited for being transferred to Purchaser due to federal or state privacy laws or other Legal Requirements; (y) any other of the foregoing which are subject to attorney-client or any other privilege; and (z) books, records, files or papers that are minute books or other general corporate records, provided that Sellers shall, upon Purchaser's reasonable request therefor, provide copies of the items described in this clause (z) to Purchaser to the extent permitted by applicable Legal Requirements);

(j)    to the extent transferable, all rights of Sellers under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to products sold or services provided to any of Sellers with respect to the Acquired

2

Restaurants or to the extent affecting any Purchased Assets or Purchased Contracts, other than any warranties, representations and guarantees pertaining to any Excluded Asset;

(k)    all rights, to the extent assignable, under any agreements in favor of any of Sellers or for the benefit of any of Sellers with current or former employees, contractors or third parties, with respect to confidentiality, non-disclosure, non-competition, non-solicitation, or other restrictive covenants, regardless of whether any such Person accepts an offer of employment from Purchaser, continues to perform services for Purchaser, or submits a bid for all or any portion of the Purchased Assets, in each case to the extent such agreement constitutes a Purchased Contract;

(l)    all Intellectual Property Assets owned by Sellers relating primarily to the Purchased Assets, including the Intellectual Property Assets set forth on Schedule 1.1(l) (the "***Purchased Intellectual Property***"); and

(m)    Subject to the provisions of Section 2.8 below, all Claims for deposits and other prepaid amounts under any of the Purchased Contracts or held by any Utilities or trade vendors relating to any of the Acquired Restaurants; provided, however, any adequate assurance deposits paid to the provider of any Utilities or held by Sellers shall be Excluded Assets for purposes of this Agreement.

1.2    Excluded Assets. The Purchased Assets shall include only those assets and interests specifically listed in Section 1.1 above and shall in all events exclude all right, title or interest of any of Sellers in, to or under any of the following (collectively, the "***Excluded Assets***"):

(a)    all cash and cash equivalents of Sellers, other than Restaurant Petty Cash and Large Party Deposits;

(b)    the Purchase Price and Sellers' rights under this Agreement;

(c)    any Excluded Contracts, including any refund, rebate, credit or payment due to Sellers thereunder or any equipment (including any POS or similar equipment), tools or other items leased, rented or otherwise provided or made available thereunder or in connection therewith;

(d)    any Claims, other than as set forth in Section 1.1(j) and Section 1.1(l), and those arising post-Closing with respect to or in connection with any Purchased Asset;

(e)    all securities, whether capital stock or debt, and other ownership interests issued by any of Sellers;

(f)    all assets of any Section 401(k) or other Seller benefit plan;

(g)    all intercompany claims by any Seller against any other Seller or any Subsidiary or other Affiliate of any Seller;

(h)    any item expressly excluded pursuant to the provisions of Section 1.1 above;

(i)    all Avoidance Actions;

(j)    all insurance policies and any premium refunds (including, without limitation, for any prepaid premiums) of Sellers arising from their insurance policies on account of reduction in workforce, liability coverage, and the like;

13986776v5

(k)     except only as provided in Sections 1.1(c), 1.1(d), 1.1(f) and 1.1(m), all rights and Claims to deposits (including, without limitation, any cash collateral for any obligation of Sellers and all Post-Petition deposits made by Sellers), credits, prepaid amounts (including, without limitation, as to Taxes), refunds, reimbursements, vendor and other rebates, set-offs and similar rights and claims of Sellers, including, without limitation, any of the foregoing relating to any Contract other than the Purchased Contracts; and

(l)     all of such Seller's interest in or rights to receive Tax refunds, credits and rebates and other governmental charges for periods prior to the Closing Date, all federal and state deferred Tax assets and the benefit of net operating loss carry forwards, carry backs or other credits of such Seller for periods or partial periods ending on or prior to the Closing Date, and such Seller's rights in and to any Tax deposits made by such Seller prior to the Closing Date;

1.3     Executory Contracts

(a)     All Purchased Contracts shall be assumed by Sellers and assigned to Purchaser at the Closing. Any Contract of any Seller that is an Excluded Contract may be assumed or rejected by Sellers in Sellers' sole discretion and shall be deemed an Excluded Asset.  Subject to the limitations set forth in Section 2.5, Purchaser shall pay all Cure Costs related to the Purchased Contracts.

(b)     As part of the Sale Motion, Sellers shall seek approval by the Bankruptcy Court of the sale, assumption and assignment by Sellers to Purchaser of all Purchased Contracts. Sellers shall serve the Sale Motion on all counterparties to all such Purchased Contracts along with a notice specifically: (i) identifying the Purchased Contracts and stating that Sellers are or may be seeking the sale, assumption and assignment of such Purchased Contracts to Purchaser, (ii) identifying the Cure Costs for each of the Purchased Contracts as determined by Sellers in accordance with Schedule 1.3(b) hereto, and (iii) notifying such counterparties to the Purchased Contracts of the deadline for objecting to the proposed assumption and assignment of the Purchased Contracts, including the proposed Cure Costs and objections related to the provision of adequate assurance of future performance. The Sale Motion shall also request that the Bankruptcy Court determine, if necessary, the Cure Costs under each of the Purchased Contracts. Purchaser may delete any Purchased Contract from Schedule 1.1(f) and Schedule 1.3(b) or add any Contract to Schedule 1.1(f) and Schedule 1.3(b) at any time no later than seven (7) days prior to the Closing Date, in each case by written notice to Sellers and the counterparties to any such Contract, but any such deletion or addition will not affect the Purchase Price.  Notwithstanding anything herein to the contrary, if a Contract is added to Schedule 1.1(f) and/or Schedule 1.3(b) after the Sale Motion is filed, the assumption and assignment of any such Contract(s) shall not be a condition to Closing and may be effected on a post-Closing basis.

2.     Consideration.

2.1     Purchase Price; Deposit.

(a)     In consideration of the transfer of the Purchased Assets to Purchaser and the other undertakings set forth herein, the purchase price shall be Three Million Six Hundred Twenty Thousand and 00/100 Dollars ($3,620,000.00) (the "**Purchase Price**") and shall be payable as set forth herein.

(b)    On the Effective Date, Purchaser shall deposit with an escrow agent mutually acceptable to the Parties (the "***Escrow Holder***"), which deposit shall be held by the Escrow Holder in a trust account, an amount equal to Three Hundred Sixty-Two Thousand and 00/100 Dollars ($362,000.00) (together with the earnings thereon, the "***Deposit***") in immediately available, good funds of the United States of America (funds delivered in this manner are referred to herein as "***Good Funds***"), pursuant to an escrow agreement to be entered by and among the Parties and the Escrow Holder on or before the Effective Date. All fees and other amounts payable to the Escrow Holder shall be split evenly between the Purchaser, on the one hand, and the Sellers, on the other hand.

2.2    <u>Disposition of Deposit at Closing, Etc.</u>

(a)    At Closing, the Deposit shall be credited and applied toward payment of the Purchase Price.

(b)    If this Agreement is duly terminated pursuant to <u>Section 14</u> without a Closing, Purchaser shall be entitled to the return of the Deposit, provided that Sellers shall be entitled to the Deposit (and the Parties shall promptly instruct the Escrow Holder to immediately pay the Deposit to the account Sellers designate) if this Agreement is duly terminated pursuant to <u>Section 14.2</u> as a result of a Purchaser Misconduct Order or pursuant to <u>Section 14.3(a)</u>.

2.3    <u>Assumed Liabilities</u>.    As additional consideration for the transfer of the Purchased Assets to Purchaser over and above the Purchase Price, effective as of the Closing Date, Purchaser shall assume only the following Liabilities of Sellers (collectively, the "***Assumed Liabilities***"):

(a)    all Liabilities arising out of the ownership or operation of any of the Purchased Assets on or after the Closing Date;

(b)    all Liabilities under any of the Purchased Contracts on or after the Closing Date (which shall include, without limitation, all Cure Costs); and

(c)    all Liabilities of Sellers under any Large Party Reservation relating to any Acquired Restaurant made with the payment of a Large Party Deposit at any time on or before the Closing Date and scheduled to be honored after the Closing Date;

(d)    any obligation of Sellers to honor Gift Certificates that remain outstanding as of the Closing Date, whether or not such Gift Certificates were issued prior to or after the commencement of the Chapter 11 Cases of Sellers and presented to Purchaser for redemption after the Closing Date; and

(e)    all Liabilities for Transfer Taxes and fifty percent (50%) of the costs and other amounts payable to the Escrow Holder under the escrow agreement.

2.4    <u>Excluded Liabilities</u>.    Notwithstanding anything to the contrary contained in this Agreement, other than the Assumed Liabilities, Purchaser shall not be obligated to assume or to perform or discharge any Liability of Sellers (such Liabilities not assumed by Purchaser, the "***Excluded Liabilities***"), which Excluded Liabilities, for the avoidance of doubt, shall include, but are not limited to, those listed on <u>Schedule 2.4</u> and the following:

(a)    Claims arising under Section 503(b)(9) of the Bankruptcy Code;

13986776v5

(b)    Claims or Liabilities arising on or before the Petition Date under the Perishable Agricultural Commodities Act, 7 U.S.C. §499a *et seq.,* the Packers and Stockyards Act, 7 U.S.C. §181 *et seq.,* or their state law correlates;

(c)    any costs or expenses incurred in connection with, or related to, the administration of the Chapter 11 Cases, including, without limitation, any accrued professional fees and expenses of attorneys, accountants, financial advisors and other professional advisors related to the Chapter 11 Cases;

(d)    all environmental Liabilities arising before the Closing Date under federal, state and local law relating to or arising out of or in connection with the Purchased Assets;

(e)    all Liabilities and obligations under Sellers' key employee retention plan;

(f)    all Liabilities relating to any Excluded Asset;

(g)    accrued vacation, sick pay, and other paid time off of the Business Employees as provided in Section 13.2, as such amounts may change (increase or decrease) in the ordinary course of the Business pending the Closing Date;

(h)    ordinary course payroll of Business Employees (i.e. paid in the ordinary course of the Sellers' current payroll practices) that comes due and payable after the Closing with respect to the portion thereof that is attributable to the payroll periods preceding the Closing Date;

(i)    except for Liabilities for the Transfer Taxes, all Liabilities of Sellers for accrued sales, use and similar taxes as of the Closing;

(j)    all post-Petition trade payables of the Business that come due after the Closing, including all credit card merchant fees, and post-Petition obligations to customers of Sellers for refunds, rebates, returns, discounts and the like as of the Closing Date, but in each of the foregoing cases described in this clause only to the extent the same were incurred by Sellers in the ordinary course of the Business from and after the commencement of the Chapter 11 Cases;

(k)    all Liabilities to the extent arising out of, relating to or in connection with any Legal Proceeding, including any pending or threatened Legal Proceeding against any Seller or relating to the Business;

(l)    except as set forth in Section 2.3(e), all Liabilities relating to the costs and other amounts payable to the Escrow Holder under the escrow agreement; and

(m)    all Liabilities for the provision of notice or payment in lieu of notice and any applicable penalties under the WARN Act arising prior to the Closing Date or arising as a result of the Contemplated Transactions.

2.5    Payment of Cure Costs.

(a)    All Cure Costs shall be the responsibility of Purchaser and shall be credited toward the Purchase Price. Notwithstanding the forgoing sentence or anything in this Agreement to the contrary set forth herein, including Schedule 1.3(b) hereto, but subject to the proviso in Section 2.5(b) below, Purchaser's right to credit the Purchase Price for amounts paid to satisfy Cure Costs shall be capped at $100,000 ("***Cure Costs Cap***").

6

(b)    If the Cure Costs for the Purchased Contracts exceed the Cure Costs Cap, Purchaser may either: (i) remove any Contracts from the list of Purchased Contracts (provided no such removal by Purchaser shall be deemed to cause the failure of a condition to Purchaser's obligations to consummate the Closing) or (ii) pay any Cure Costs that exceed the Cure Costs Cap at its own expense without any further reduction to the Purchase Price; provided that, notwithstanding anything in this Section 2.5 or Section 3.3(a) to the contrary, to the extent the aggregate Cure Costs for the Restaurant Leases exceed the Cure Costs Cap, all of such Cure Costs shall be credited toward the Purchase Price unless Sellers expressly elect otherwise in a writing delivered to Purchaser (the "*Cure Costs Election Notice*") within five (5) days following the calculation of such Cure Costs. If Sellers deliver a Cure Costs Election Notice, then Purchaser may terminate this Agreement, but only if Purchaser delivers written notice of such termination to Sellers within five (5) days after the delivery of the Cure Costs Election Notice.

2.6    Transitional Matters. From and after Closing, Sellers shall retain full right and authority to use, enforce, pursue remedies and take actions with respect to any of the Excluded Assets.

(a)    From and after the Closing, Purchaser will retain and make available to Sellers or any trustee or other bankruptcy estate representative and their respective representatives acting on behalf of Sellers' estates, during normal business hours and upon reasonable advance written notice to Purchaser of not less than forty-eight hours and for a period of 2 years following the Closing Date, the Documents delivered by Sellers to Purchaser, if reasonably needed by Sellers for liquidation, winding up, Tax reporting or other proper purposes; provided, that Sellers will use reasonable efforts to retain copies of Documents, and the Parties otherwise will reasonably cooperate to minimize inconvenience to Purchaser. Further, during the same period, Purchaser shall promptly provide such reports as Sellers may reasonably request to facilitate Sellers' post-Closing activities for the purposes described above in this Section 2.6(a) at Sellers' cost.

(b)    Previously Omitted Contracts.

(i)    If, prior to or following Closing, it is discovered that a Contract should have been listed on Schedule 1.1(f) but was not listed on Schedule 1.1(f) (any such Contract, a "*Previously Omitted Contract*"), Sellers shall, promptly following the discovery thereof (but in no event later than five (5) Business Days following the discovery thereof), notify Purchaser in writing of such Previously Omitted Contract and all Cure Costs (if any) for such Previously Omitted Contract. Purchaser shall thereafter deliver written notice to Sellers, no later than five (5) Business Days following notification of such Previously Omitted Contract from Sellers, designating such Previously Omitted Contract as "*Assumed*" or "*Rejected*" (a "*Previously Omitted Contract Designation*"). A Previously Omitted Contract designated in accordance with this Section 2.6(b)(i) as "*Rejected*," or with respect to which Purchaser fails to timely deliver a Previously Omitted Contract Designation, shall be an Excluded Contract.

(ii)    If Purchaser designates a Previously Omitted Contract as "*Assumed*" in accordance with Section 2.6(b)(i), (A) Schedule 1.1(f) shall be amended to include such Previously Omitted Contract and (B) Sellers shall serve a notice (the "*Previously Omitted Contract Notice*") on the counterparties to such Previously Omitted Contract designated as "*Assumed*" notifying such counterparties of the Cure Costs with respect to such Previously Omitted Contract and Sellers' intention to assume and assign such Previously Omitted Contract in accordance with this Section 2.6(b) with no adjustment to the Purchase Price. The Previously Omitted Contract Notice shall provide the counterparties to such Previously Omitted Contract with seven (7) days to object, in

writing to Sellers and Purchaser, to the assumption, assignment and sale of the Previously Omitted Contract, including the Cure Costs for such Previously Omitted Contract. If the counterparties, Sellers and Purchaser are unable to reach a consensual resolution with respect to the objection, Sellers will seek an expedited hearing before the Bankruptcy Court to determine the Cure Costs and approve the assumption, assignment and sale. If no objection is timely served on Sellers and Purchaser, Sellers shall seek an Order of the Bankruptcy Court fixing the Cure Costs and approving the assumption, assignment and sale of the Previously Omitted Contract to Purchaser.

(c)    To the extent that the assignment to Purchaser of any Purchased Contract pursuant to this Agreement is not permitted without the consent of a third party, and such restriction cannot be effectively overridden or canceled by the Sale Order or other related order of the Bankruptcy Court, the Parties will use commercially reasonable efforts to obtain consent prior to the Closing.

(d)    As requested by Purchaser and no later than one (1) Business Day prior to the Closing, Sellers will undertake in good faith to complete a sampling of the Inventory that is in the possession of Sellers as of the Closing Date (the "*Inventory Assessment*"), using commercially reasonable procedures, subject to the supervision of Purchaser and its accountants.  Sellers shall deliver the results of the Inventory Assessment to Purchaser prior to the Closing. Notwithstanding the foregoing, neither such sampling nor the results thereof shall affect on the Parties' respective rights and obligations under this Agreement.

2.7    Purchase Price Allocation.    Not later than sixty (60) days following the Closing Date, Purchaser shall prepare and deliver to Sellers for their review and consideration a schedule (the "**Allocation Schedule**") allocating the Purchase Price among the various assets comprising the Purchased Assets in accordance with Treasury Regulation 1.1060-1 (or any comparable provisions of state or local Tax law) or any successor provision. If Sellers disagree with or raise objections to the Allocation Schedule, Purchaser and Sellers will negotiate in good faith to resolve such objections. If the Parties are able to agree upon the allocation of the Purchase Price, Purchaser and Sellers shall report and file all Tax Returns (including any amended Tax Returns and claims for refund) consistent with such mutually agreed Purchase Price allocation, and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any Taxing authority or any other proceedings). Purchaser and Sellers shall file or cause to be filed any and all forms (including U.S. Internal Revenue Service Form 8594), statements and schedules with respect to such allocation, including any required amendments to such forms. If, on the other hand, the Parties are unable mutually to agree upon the manner in which the Purchase Price should be allocated, Purchaser and Sellers shall be free to make their own respective allocations of the Purchase Price for Tax purposes. Notwithstanding any other provisions of this Agreement, in the event the Parties mutually agree upon the allocation of the Purchase Price, the provisions of this Section 2.7 shall survive the Closing.

2.8    Apportionment. Before the Closing Date, Sellers and Purchaser shall make mutually satisfactory arrangements with respect to, or take readings or other measurements of, gas, water, electricity and other utilities at the Acquired Restaurants (the "*Utilities*"). On and as of the Closing, Sellers and Purchaser shall mutually determine (or, to the extent impractical, using the Parties' best estimates as of the Closing Date), the amount of any rebates and advances under beverage and other supplier contracts relating to the Acquired Restaurants (to the extent the same constitute Purchased Contracts), and all amounts for Utilities, rent (including CAM and percentage rent under the Restaurant Leases), common area expense, real estate taxes, and other items that are customarily prorated in non-bankruptcy transactions of this type, in each case arising out of or relating to the Acquired Restaurants and relating to periods that include or straddle the Closing Date. The Parties agree to prorate each of the foregoing between the Sellers, on the one hand, and the Purchaser, on

13986776v5

the other hand, on a per diem basis (employing a 365-day year). For purposes of such proration, items of income and expense relating to the operation of the Acquired Restaurants prior to the Closing shall be for the account of the Sellers, and items of income and expense relating to the operation of the Acquired Restaurants on or after the Closing shall be for the account of the Purchaser. To the extent the prorations contemplated by this Section 2.8 can be determined as of the Closing Date, they shall be added or subtracted, as the case may be, to the Purchase Price at the Closing. From and after the Closing until three (3) month anniversary thereof, the Sellers, on the one hand, and the Purchaser, on the other hand, shall from time to time make payments to the other(s) as necessary to effect the intent of this <u>Section 2.8</u>.

3.      <u>Closing Transactions</u>

        3.1      <u>Closing</u>. The closing of the Contemplated Transactions (the "***Closing***") shall take place at 10:00 a.m. on or before the third (3ʳᵈ) Business Day following the satisfaction, or waiver by the appropriate Party, of all the conditions contained in <u>Section 4</u>, or on such other date (no later than the Outside Date) as may be agreed to by the Parties hereto (the date on which the Closing occurs, hereinafter the "***Closing Date***"). Items of income and expense on the Closing Date shall be for the account of the Purchaser.

        3.2      <u>Sellers' Deliveries to Purchaser at Closing</u>.   On the Closing Date, Sellers shall make the following deliveries to or for the benefit of Purchaser:

                (a)      one or more Assignments and Assumptions of Restaurant Leases, in a form mutually agreed to by the Parties, acting in good faith, duly executed by Sellers, with respect to the Restaurant Leases (the "***Assignments of Restaurant Leases***") to the extent the same constitute a Purchased Contract;

                (b)      an Assignment and Assumption of Contracts, in a form mutually agreed to by the Parties, acting in good faith, duly executed by Sellers, pursuant to which Sellers' interest in all Purchased Contracts (other than any Restaurant Leases) shall be assigned to Purchaser (the "***Assignment of Other Contracts***");

                (c)      an Assignment of Intangible Property Assets, duly executed by Sellers, in a form mutually agreed to by the Parties, acting in good faith, pursuant to which Sellers' interest in all the Intangible Property Assets shall be assigned to Purchaser (the "***Assignment of Intangible Property Assets***");

                (d)      a Bill of Sale and Assignment, in a form mutually agreed to by the Parties, acting in good faith, duly executed by Sellers, pursuant to which Sellers' interest in any Purchased Assets not otherwise assigned at the Closing shall be assigned to Purchaser (the "***Bill of Sale***");

                (e)      (i) duly executed assignments to Purchaser of the registered Trademarks and Trademark applications included in the Purchased Intellectual Property, in each case, in a form suitable for recording in the U.S. Patent and Trademark Office and (ii) duly executed assignments to Purchaser of any URLs, including any domain names;

                (f)      the duly executed Management Agreements, which shall address any interim arrangements necessary pending the transfer of Liquor Licenses to Purchaser, substantially in the form attached as <u>Exhibit A</u> hereto;

9

(g)       non-solicitation and confidentiality agreements duly executed by each of Ned Lidvall, Steven Rockwell, William Latham, David Roberts and Ronald Rosati substantially in the form attached as Exhibit B hereto prohibiting the solicitation of employees of the Acquired Restaurants for a period of three (3) years after the Closing Date (the "***Restrictive Covenant Agreements***");

(h)       certificates of title, duly executed by Sellers, required to convey ownership of any motor vehicles or similar equipment included within the Purchased Assets;

(i)       the certificate contemplated by Section 4.1(a), duly-executed by Sellers; and

(j)       appropriate evidence of all necessary Entity action by Sellers in connection with the Contemplated Transactions (together with a certified copy of a good standing certificate or equivalent for each Seller), including, without limitation: (i) certified copies of resolutions duly adopted by Sellers' Board of Managers (or other governing body, as appropriate) approving the Contemplated Transactions and authorizing the execution, delivery, and performance by Sellers of this Agreement; and (ii) a certificate as to the incumbency of those officers of Sellers executing this Agreement and any instrument or other document delivered in connection with the Contemplated Transactions.

3.3    Purchaser's Deliveries to Sellers at Closing.    On the Closing Date, Purchaser shall:

(a)       pay to Sellers, by wire transfer of Good Funds, an amount equal to the Purchase Price, less the Cure Costs actually paid by the Purchaser (and subject to the Cure Costs Cap) and the funds to be released pursuant to Section 3.3(b) below (the "***Cash Purchase Price***");

(b)       instruct the Escrow Holder in writing to release to Sellers, by wire transfer of Good Funds to the account designated by the Sellers, the Deposit as a credit against the Purchase Price;

(c)       pay, by wire transfer of Good Funds, all Cure Costs to the parties to whom and pursuant to the terms by which the Bankruptcy Court directs such payments to be made under the Sale Order;

(d)       deliver the certificate contemplated by Section 4.1(a), duly executed by Purchaser;

(e)       deliver a counterpart of the Assignments of Restaurant Leases, duly executed by Purchaser;

(f)       deliver a counterpart of the Assignment of Other Contracts, duly executed by Purchaser;

(g)       deliver a counterpart of the Assignment of Intangible Property Assets, duly executed by Purchaser;

(h)       deliver an Assumption of Liabilities with respect to the Assumed Liabilities, in a form mutually agreed to by the Parties, acting in good faith, duly executed by Purchaser (the "***Assumption of Liabilities***");

(i)        deliver a counterpart of each Management Agreement, duly executed by Purchaser;

(j)        deliver counterparts of each of the Non-Solicitation Agreements, each duly executed by Purchaser;

(k)        deliver any certificates of title required to convey ownership of any motor vehicles or similar equipment owned by Sellers to Purchaser, if acknowledgement or endorsement thereof is required by Purchaser;

(l)        deliver appropriate evidence of all necessary Entity action by Purchaser in connection with the Contemplated Transactions (together with a certified copy of a good standing certificate or equivalent for Purchaser), including, without limitation: (i) certified copies of resolutions duly adopted by Purchaser's mangers and/or members, as appropriate, approving the Contemplated Transactions and authorizing the execution, delivery, and performance by Purchaser of this Agreement; and (ii) a certificate as to the incumbency of those officers of Purchaser executing this Agreement and any instrument or other document delivered in connection with the Contemplated Transactions; and

(m)        deliver any such other documents, funds or other things reasonably requested by Sellers or contemplated by this Agreement to be delivered by Purchaser to Sellers at the Closing.

3.4    <u>Sales, Use and Other Taxes</u>.    Any and all sales, purchase, transfer, stamp, documentary stamp, use or similar taxes under the laws of the states in which any portion of the Purchased Assets is located, or any subdivision of any such state, or under any federal law or the laws or regulations of any federal agency or authority, which may be payable by reason of the sale or transfer of the Purchased Assets under this Agreement or the Contemplated Transactions (collectively, the "***Transfer Taxes***") shall be the sole responsibility of the Purchaser, provided the Parties shall cooperate with respect to determining, and reducing, the amount thereof the extent permitted by applicable Legal Requirements. If applicable Legal Requirements mandate that Sellers remit any Transfer Taxes to Governmental Bodies, Purchaser shall timely remit such Transfer Taxes to the Sellers for payment to the applicable Governmental Bodies.

3.5    <u>Possession</u>.    Right to possession of the Purchased Assets shall transfer to Purchaser on the Closing Date. Sellers shall transfer and deliver to Purchaser on the Closing Date such keys, locks and safe combinations and other similar items as are required to obtain occupation and control of the Purchased Assets, and shall also make available to Purchaser as soon as reasonably possible after the Closing Date at their then-existing locations the originals of all documents in Sellers' possession that are required to be transferred to Purchaser by this Agreement.

3.6    <u>Closing Date</u>.    All actions to be taken on the Closing pursuant to this Agreement shall be deemed to have occurred simultaneously, and no act, document or transaction shall be deemed to have been taken, delivered or effected until all such actions, documents and transactions have been taken, delivered or effected. Unless provided otherwise herein or agreed otherwise in writing by the Parties, documents delivered at the Closing shall be dated as of the Closing Date.

4.    <u>Conditions Precedent to Closing.</u>

4.1    <u>Conditions to Sellers' Obligations</u>.    Sellers' obligation to make the deliveries required of Sellers at the Closing Date and otherwise consummate the Contemplated Transactions

shall be subject to the satisfaction of each of the following conditions (unless such condition is waived in writing by Sellers):

(a)    All of the representations and warranties of Purchaser contained herein shall continue to be true and correct at the Closing in all material respects, and Purchaser shall have substantially performed or tendered performance of each material covenant on Purchaser's part to be performed which, by its terms, is required to be performed at or before the Closing (including its delivery covenants under Section 3.3), and Sellers shall have received a certificate by an officer of Purchaser, dated as of the Closing Date, to such effect.

(b)    The Sellers shall have received the Purchase Price in Good Funds from or on behalf of the Purchaser, and the Purchaser shall have assumed the Assumed Liabilities.

(c)    No action, suit or other proceedings that is not stayed by the Bankruptcy Court shall be pending before any Governmental Body seeking or threatening to restrain or prohibit the consummation of the Contemplated Transactions, or seeking to obtain substantial damages in respect thereof, or involving a Claim that consummation thereof would result in the violation of any Legal Requirement of any Governmental Body having appropriate jurisdiction.

(d)    The Bankruptcy Court shall have entered the Procedures Order and the Sale Order, both in accordance with Section 9 below, and the Sale Order shall not have been reversed or stayed as of the Closing Date.

4.2    Conditions to Purchaser's Obligations. Purchaser's obligation to make the deliveries required of Purchaser at the Closing and otherwise consummate the Contemplated Transactions shall be subject to the satisfaction of each of the following conditions (unless such condition is waived in writing by Purchaser):

(a)    All of the representations and warranties of Sellers contained herein shall continue to be true and correct at the Closing in all material respects, and Sellers shall have substantially performed or tendered performance of each material covenant on Sellers' part to be performed which, by its terms, is required to be performed at or before the Closing (including their delivery covenants under Section 3.3), and Purchaser shall have received a certificate by officers of Sellers, dated as of the Closing Date, to such effect.

(b)    No action, suit or other proceedings that is not stayed by the Bankruptcy Court shall be pending before any Governmental Body seeking or threatening to restrain or prohibit the consummation of the Contemplated Transactions, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any Legal Requirement of any Governmental Body having appropriate jurisdiction.

(c)    The Bankruptcy Court shall have entered the Procedures Order and the Sale Order, both in accordance with Section 9 below, and the Sale Order shall not have been reversed or stayed as of the Closing Date.

5.    Sellers' Representations and Warranties.

Each of Sellers (as to itself) hereby makes the following representations and warranties to Purchaser:

12

5.1    Organization. Each of Sellers is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or other formation. Each of Sellers is duly authorized to conduct business and is in good standing under the laws of each jurisdiction where qualification is required. Each of Sellers has all requisite Entity power and authority to own, lease and, subject to the provisions of the Bankruptcy Code applicable to debtors in possession, to operate its properties, carry on the Business as now being conducted, and to enter into this Agreement and to consummate the Contemplated Transactions.

5.2    Validity and Enforceability.    Subject to the entry and effectiveness of the Sale Order, the execution, delivery and performance of this Agreement by each of Sellers, and the consummation by each of Sellers of the Contemplated Transactions, have been duly authorized by all requisite corporate action. Subject to the entry and effectiveness of the Sale Order, this Agreement has been duly and validly executed and delivered by each of Sellers and (assuming this Agreement constitutes a valid and binding agreement of Purchaser) constitutes a valid and binding agreement of each of Sellers, enforceable against each of Sellers in accordance with its terms, except as to the effect, if any, of the Standard Exceptions to Enforceability.

5.3    Litigation.  There is no material legal proceeding of any type or kind (whether governmental, quasi-governmental, judicial or in an alternative dispute resolution forum) pending that, once the Sale Order is given effect, will result in any material Liability on Purchaser or, to Sellers' Knowledge, threatened against or affecting any of Sellers that would likely result in the imposition of any material Liability on Purchaser or in respect of the Purchased Assets, nor is there any material judgment or Order of any Governmental Body outstanding against Sellers.

5.4    Title to Assets; Sufficiency of Assets. At the Closing, Purchaser will be vested with good and valid title to, or in the case of leased or licensed assets, good and valid leasehold or license interest in, such Purchased Assets, free and clear of all Encumbrances other than Permitted Encumbrances and Excluded Liabilities, to the fullest extent permissible under Legal Requirements, including Section 363(f) of the Bankruptcy Code. Except for the Excluded Assets and all Contracts identified by Seller (whether or not Purchased Assets), the Purchased Assets constitute substantially all of the assets used or necessary for the operation of the Acquired Restaurants as presently conducted.

5.5    Employee Matters.  No Seller has and has not had any "employee benefit plan," as defined in Section 3(3) of ERISA and no health benefits are provided or have been provided in the past.  It is understood and agreed that the Purchaser is not assuming any employee plans or liabilities associated therewith, and that the Sellers shall retain all such employee plans, if any, including all obligations deriving directly or indirectly from sponsoring or participating in such employee plans.

5.6    Due Notice.  Sellers have served, or will serve, notice of the Chapter 11 Cases on all parties in interest entitled to notice under the Bankruptcy Code or Federal Rules of Bankruptcy Procedure.

5.7    Broker's or Finder's Fees.    No agent, broker or Person acting on behalf of any of Sellers is, or will be, entitled to any commission or broker's or finder's fees from Purchaser in connection with the Contemplated Transactions.

5.8    No other Representations or Warranties. EXCEPT AS EXPRESSLY PROVIDED IN THIS SECTION 5, (A) NONE OF SELLER, ITS AFFILIATES, OR ANY OF ITS OR THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES OR REPRESENTATIVES ARE MAKING OR HAVE MADE ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND,

NATURE OR DESCRIPTION, EXPRESS OR IMPLIED (INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF TITLE, NON-INFRINGEMENT, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE), AND (B) EACH SELLER (ON ITS BEHALF AND ON BEHALF OF ITS AFFILIATES AND ANY OF ITS OR THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES OR REPRESENTATIVES) EXPRESSLY DISCLAIMS ANY OTHER REPRESENTATION OR WARRANTY, INCLUDING ANY REPRESENTATIONS OR WARRANTIES WITH RESPECT TO ANY PROJECTIONS OR FUTURE PERFORMANCE OF THE BUSINESS OR AS TO THE VALUE OR QUALITY OF THE BUSINESS OR THE PURCHASED ASSETS. WITHOUT LIMITING THE FOREGOING, NO REPRESENTATION OR WARRANTY OF ANY KIND IS MADE WITH RESPECT TO ANY DOCUMENTS, DATA, INFORMATION OR MATERIALS PROVIDED TO PURCHASER, ITS AFFILIATES OR ITS OR THEIR RESPECTIVE EMPLOYEES, CONSULTANTS, REPRESENTATIVES OR AGENTS, WHETHER IN CONNECTION WITH PURCHASER'S DUE DILIGENCE INVESTIGATION OR OTHERWISE.

6.    <u>Purchaser's Warranties and Representations.</u>

In addition to the representations and warranties contained elsewhere in this Agreement, Purchaser hereby makes the following representations and warranties to Sellers as of the Effective Date and as of the Closing Date:

6.1    <u>Organization</u>.    Purchaser is a limited liability company duly formed, validly existing and in good standing under the laws of Delaware. Purchaser has all requisite limited liability company power and authority to own, lease and operate its properties, execute and deliver this Agreement, and to perform its obligations hereunder and consummate the Contemplated Transactions.

6.2    <u>Validity and Enforceability</u>.    This Agreement has been duly executed and delivered by Purchaser and constitutes the valid and binding obligation of Purchaser enforceable against it in accordance with its terms, except as may be limited by the Standard Exceptions to Enforceability.

6.3    <u>No Conflict; Consents</u>.    The execution, delivery and performance of this Agreement by Purchaser, and the consummation by Purchaser of the Contemplated Transactions, have been duly and validly authorized, and Purchaser is not required Legal Requirements or any other requirement give any notice to, make any filing with, or obtain any consent from any Governmental Body or other Person in connection with any of the foregoing. The execution and delivery of this Agreement, the consummation of the Contemplated Transactions, and the performance of, fulfillment of and compliance with the terms and conditions hereof by Purchaser, do not and will not (a) conflict with or result in a breach of the articles of incorporation or bylaws of Purchaser, (b) violate any Legal Requirement, or (c) violate or conflict with or constitute a default under any agreement, instrument or writing of any nature to which Purchaser is a party or by which Purchaser or its assets or properties may be bound.

6.4    <u>Financial Resources</u>.    The Purchaser has the financial resources necessary to consummate the Contemplated Transactions upon the terms and conditions set forth in this Agreement, and such financial resources are not subject to any constraints, conditions or contingencies that could in any way materially affect the Purchaser's ability to consummate the Contemplated Transactions or perform hereunder.

14

6.5    Broker's or Finder's Fees.    No agent, broker or Person acting on behalf of Purchaser is, or will be, entitled to any commission or broker's or finder's fees from Sellers in connection with the Contemplated Transactions.

6.6    Non-Reliance. PURCHASER ACKNOWLEDGES THAT NONE OF PURCHASER, ITS AFFILIATES, OR ANY OF ITS OR THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES OR REPRESENTATIVES IS RELYING, HAS RELIED OR WILL RELY UPON ANY REPRESENTATION OR WARRANTY MADE BY ANY SELLER, OR ANY OTHER PERSON ON SUCH SELLER'S BEHALF, EXCEPT TO THE EXTENT OF THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN SECTION 5 OF THIS AGREEMENT.

7.    Computer/POS Systems and Soft Drink Supply Agreements.

7.1    Computer/POS Systems.

(a)    For a reasonable period after the Closing (such period not to exceed thirty (30) days), each Seller will provide, or shall cause to be provided, the following support services to Purchaser for the POS systems, MWS and/or TWS located in an Acquired Restaurant: (i) those services provided by each Seller's customer support center in the ordinary course of business prior to the Closing Date; and (ii) daily polling of the POS system and preparation of applicable store-level reports (such reports are for individual Acquired Restaurant) in the same manner as provided to Sellers prior to the Closing in the ordinary course of business. Sellers provide such services without representations or warranties of any kind, nature or description, express or implied, with respect thereto, and Purchaser hereby assumes the risk of Sellers' provision of such services.

(b)    Each Seller will notify its processing agents for credit card, debit card and gift card transactions ("*Electronic Transactions*") of the change in ownership of the Acquired Restaurant.  Following the Closing Date and for a period not to exceed one (1) month, the Sellers shall use commercially reasonable efforts to make the integrated credit card terminals, if any, included in such POS systems may be utilized by Purchaser to process Electronic Transactions.

7.2    Soft Drink Supply Agreements. Schedule 7.2 lists, to the Sellers' Knowledge, the owners of the post-mix dispensing equipment located at each Acquired Restaurant ("*Soft Drink Suppliers*"). Such equipment may include the dispenser unit (e.g., "*legacy*", "*bevariety*", or "*freestyle*" equipment), bag-in-box pumps, racks, carbonators, regulators, lines and fittings.  Each Seller agrees to terminate and be responsible for any and all costs and fees charged by Soft Drink Suppliers in connection with the termination of any lease between a Seller and a Soft Drink Supplier for the post-mix dispensing equipment located in each Acquired Restaurant.

8.    Covenants

8.1    Liquor License Approvals. From and after the Closing, Sellers shall reasonably cooperate with Purchaser in connection with Purchaser's filings with any Governmental Body or third party with respect to any of the Liquor Licenses and obtaining the necessary consents and approvals pertaining to transfer and/or issuance of the Liquor Licenses to Purchaser ("*Liquor License Approvals*"). Purchaser shall use reasonable efforts to obtain the Liquor License Approvals as soon as reasonably practicable after the Effective Date. If the Parties execute one or more Management Agreements at the Closing, the Liquor Inventory located within the Acquired Restaurants subject to such Management Agreement(s) will not be transferred to Purchaser at the Closing and will be transferred to Purchaser only in accordance with the terms of the applicable

15

Management Agreement. Upon the termination of the Management Agreement with respect to an Acquired Restaurant and assuming that the agreement governing the Liquor Inventory is a Purchased Contract, if any, each Seller will either, at the option of Purchaser, (i) assign its interest in any applicable beverage distributor advance with respect to such Acquired Restaurant to Purchaser and obtain an acknowledgement of such assignment from the applicable beverage vendor(s) or (ii) terminate the applicable beverage distributor advance(s) with respect to such Acquired Restaurant and, subject to such beverage vendor withholding any amounts due to such vendor for Liquor Inventory delivered after the Closing to the Acquired Restaurants, direct the applicable beverage vendor to pay any remaining balance of the beverage distributor advance to Purchaser.

8.2    Adequate Assurance Regarding Purchased Contracts. With respect to each Purchased Contract set forth on Schedule 1.1(f), Purchaser shall provide adequate assurance of the future performance of such Purchased Contract by Purchaser as required by Sections 365(b)(1)(C) and/or 365(f)(2)(B) of the Bankruptcy Code, as applicable, and Purchaser shall bear all risk associated with any failure by Purchaser to make such showing to the Bankruptcy Court's satisfaction.

8.3    No Survival of Representations and Warranties. The Parties hereto agree that the representations and warranties of Sellers contained in this Agreement shall not survive the Closing hereunder, and no Seller shall have any liability to Purchaser after the Closing for any breach thereof or inaccuracy therein.  The Parties hereto agree that the covenants contained in this Agreement to be performed or otherwise adhered to at or after the Closing shall survive the Closing hereunder, and each Party hereto shall be liable to the other after the Closing for any breach thereof, except to the extent provided otherwise herein.

9.    Bankruptcy Court Approvals.

9.1    Sale Motion. As promptly as practicable after the execution of this Agreement, Sellers will file or cause to be filed with the Bankruptcy Court a motion (the "*Sale Motion*"): (1) seeking entry of an order (the "*Procedures Order*"): (i) approving bidding procedures (the "*Bidding Procedures*") to be employed with respect to the proposed sale of the Purchased Assets and the Contemplated Transactions, (ii) scheduling an auction (the "*Auction*") related to the sale of the Purchased Assets and the Contemplated Transactions in the event that the Sellers are able to identify one or more additional qualified bidders in accordance with the Bidding Procedures, and (iii) approving (a) the form of this Agreement as a stalking horse agreement to be used as a template in connection with the Bidding Procedures and Auction and (b) the Break-Up Fee and the expense reimbursement contemplated by Section 12.5; (2) scheduling a hearing before the Bankruptcy Court to approve the Contemplated Transactions and the Sale Motion on a final basis (the "*Sale Hearing*"); and (3) seeking entry of an order (the "*Sale Order*") approving the sale of the Purchased Assets and the assumption and assignment of the Purchased Contracts to Purchaser or the successful bidder at the Auction. The Sale Motion, the Procedures Order, the Sale Order, and any other order of the Bankruptcy Court approving the Contemplated Transactions shall be in a form that is reasonably acceptable to Purchaser.  The Sale Order shall, at a minimum, transfer the Purchased Assets to Purchaser free and clear of all claims, interests, and Encumbrances (other than the Assumed Liabilities and the Permitted Encumbrances).

9.2    Bankruptcy Court Approval. (a) Sellers and Purchaser acknowledge and agree that this Agreement, the sale of the Purchased Assets and the Contemplated Transactions are subject to higher or otherwise better bids and Bankruptcy Court approval.  Purchaser and Sellers acknowledge that Sellers must take reasonable steps to demonstrate that they have sought to obtain the highest

16

or otherwise best offer for the Purchased Assets, including giving notice thereof to the creditors of Sellers and other interested parties, providing information about Sellers' businesses to prospective bidders, entertaining higher or otherwise better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Purchased Assets and submit a qualified bid therefor, conducting the Auction. The representations and warranties of the Sellers set forth in this Agreement are qualified in all respects by this Section 9.2.

(b)   If this Agreement and the sale of the Purchased Assets to Purchaser on the terms and conditions hereof are determined to be the "*highest or otherwise best offer*" in accordance with the Procedures Order and based on the Auction (if any), Sellers shall promptly present the Agreement (with any modifications, if any, made at the Auction) to the Bankruptcy Court and seek entry of the Sale Order.

(c)   Sellers covenant and agree that if the Sale Order is entered, the terms of any plan submitted by Sellers to the Bankruptcy Court for confirmation, or the terms of any other sale of Sellers' or their Affiliates' assets submitted by Sellers to the Bankruptcy Court for approval, will not conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement and the rights of Purchaser hereunder, or in any way prevent or interfere with the consummation or performance of the Contemplated Transactions including any transaction that is contemplated by or approved pursuant to the Sale Order.

(d)   If the Sale Order or any other orders of the Bankruptcy Court relating to this Agreement are appealed or petition for certiorari or motion for rehearing or reargument is filed with respect thereto, Sellers agree to take all action as may be commercially reasonable and appropriate to defend against such appeal, petition or motion and Purchaser agrees to cooperate in such efforts and each Party agrees to use its commercially reasonable efforts to obtain an expedited resolution of such appeal; that nothing in this Section 9 shall be deemed to limit any right to termination of this Agreement in accordance with Section 14 hereof.

9.3   Cooperation. (a) From and after the date of this Agreement and until the Closing Date (or any earlier date on which this Agreement is determined not to be the "*highest or otherwise best offer*" in accordance with the Procedures Order), to the extent reasonably practicable, Sellers will deliver to Purchaser drafts of any and all material pleadings, motions, notices, statements, applications, schedules, reports and other papers to be filed or submitted by Sellers in connection with this Agreement for Purchaser's prior review.  Sellers will make commercially reasonable efforts to consult and cooperate with Purchaser regarding (i) any such pleadings, motions, notices, statements, applications, schedules, reports or other papers, (ii) any discovery taken in connection with the motions seeking approval of the Procedures Order or Sale Order (including, without limitation, any depositions) and (iii) any hearing relating to the Procedures Order or Sale Order, including, without limitation, the submission of any evidence, including witnesses testimony, in connection with such hearing.

(b)   Sellers acknowledge and agree, and the Sale Order will provide that, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, liabilities and Encumbrances on, against or created by Sellers or their bankruptcy estates, shall be fully released from and with respect to the Purchased Assets, which will be transferred to Purchaser free and clear of all obligations, liabilities, Taxes and Liens except for Assumed Liabilities and Permitted Encumbrances.

10.    Commercially Reasonable Efforts.

10.1    Commercially Reasonable Efforts.  During the period between the Effective Date and Closing, Sellers and Purchaser shall (a) use their commercially reasonable efforts (i) to cause the conditions in Section 4 to be satisfied, (ii) to deliver or cause to be delivered at the Closing the items to be delivered by Sellers and Purchaser pursuant to Section 3.2 and Section 3.3, respectively, and (iii) to take all other actions to consummate the Contemplated Transactions, and (b) not take any action that will have the effect of unreasonably delaying, impairing or impeding the receipt of any authorizations, Consents, or Orders to be sought pursuant to this Agreement.

10.2    Use of Name. Each Seller hereby acknowledges and agrees that, Purchaser will acquire at the Closing all of the Sellers' rights in respect of the name "*Babalu*", "*Babalu Tapas and Tacos*", "*Babalu Tacos and Tapas*" and any similar names, including all right, title, and interest in and to any of a Seller's rights in and to trademarks incorporating the names, whether registered or unregistered, under common law or otherwise. Thereafter no Seller or any of their controlled Affiliates shall have any right to use, or authorize others to use, such names for any purpose whatsoever.  Each Seller hereby covenants and agrees for the benefit of Purchaser, its Affiliates and their respective successors and assigns that from and after the Closing Date no Seller or any controlled Affiliate shall use the name "*Babalu*", "*Babalu Tapas and Tacos*", "*Babalu Tacos and Tapas*" or any confusingly similar name or title, either alone or in combination with any other words or terms, for any purpose whatsoever; provided, however, each Seller shall have a limited right and license to use the name "*Babalu*" as necessary to wind down of its operations and complete the Chapter 11 Cases, subject to the following paragraph.

Within five (5) days after the Closing Date, Sellers shall use commercially reasonable efforts to take such entity and other actions necessary to change their company names to ones that are not similar to, or confusing with, their current names, including any necessary filings required by the law of the state of their respective organization, and shall promptly thereafter provide Purchaser with written evidence of such name changes. Sellers shall also file a motion with the Bankruptcy Court to change the captions of the Chapter 11 Cases to reflect such name changes. Without limiting the foregoing, as soon as reasonably possible after the Closing Date, each Seller shall immediately cease the use of any signs, purchase orders, invoices, sales orders, labels, letterheads, shipping documents, business cards and other materials that reference any or all of the words "*Babalu*", "*Babalu Tapas and Tacos*", "*Babalu Tacos and Tapas*".  Each Seller acknowledges and agrees that Purchaser would not have entered into this Agreement in the absence of the covenants contained in this Section 10.2 and, in the event of any breach of such covenants, Purchaser shall be entitled, in addition to any other remedies available to Purchaser at law, to an injunction or other equitable relief to compel each Seller or its controlled Affiliate to comply with the covenants contained in this Section 10.2.

11.    Conduct Pending Closing; Loss or Destruction of Acquired Restaurants.

11.1    Ordinary Course of Business. Except with the prior written consent of Purchaser, as otherwise contemplated or permitted by this Agreement or as required by the Bankruptcy Code or the Bankruptcy Court, from the Effective Date until the Closing Date, Sellers shall use commercially reasonable efforts to operate the Acquired Restaurants in the ordinary course of business (i.e., as such Acquired Restaurants have been operated during the immediately preceding 12-month period), comply with all Legal Requirements applicable to the operation of the Acquired Restaurants and preserve their present business organization intact (in each of the foregoing cases, taking into account Sellers' status as debtors-in-possession), including, maintaining the Inventory

18

at levels consistent with the management of restaurants of a quality and type similar to the Acquired Restaurants.

11.2    Event Notification. Sellers shall promptly inform Purchaser in writing of the occurrence or non-occurrence of any event that, to Sellers' Knowledge, would cause any condition set forth in Section 4.2 not to be satisfied or the breach of any covenant hereunder by Sellers.

11.3    Public Announcement. Each Party agrees that it will not make any public announcement or issue any press release or respond to any press inquiry with respect to this Agreement or the Contemplated Transactions without the prior approval of the other Party (which approval will not be unreasonably withheld), except as may be required (i) by any applicable Legal Requirement, or (ii) to administer the Chapter 11 Cases.

11.4    Loss or Destruction of Restaurants or Purchased Assets. If any Restaurant that was intended to be an Acquired Restaurant or a material portion of the Purchased Assets located thereat is damaged or destroyed by fire or other casualty (a "*Casualty*") that occurs during the period that begins on the Effective Date and ends as of the Closing, Sellers shall promptly provide the Purchaser with all pertinent information regarding the Casualty (the "*Casualty Notice*"). If the Sellers reasonably estimate, after consulting with Purchaser, that the costs of repairing any damage resulting from such Casualty to such Restaurant and such Purchased Assets located thereat exceeds Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00) (each such Casualty, a "*Material Casualty*"), Purchaser, in its sole discretion, shall (a) remove such damaged Restaurant from the Contemplated Transactions with a corresponding reduction in the Purchase Price solely in respect of such damaged Restaurant and such damaged Purchased Assets (and the Parties shall negotiate the amount of such reduction in good faith), (b) terminate this Agreement pursuant to Section 14.4(i) or (c) subject to the other terms of this Agreement, consummate the Contemplated Transactions in accordance herewith without taking any action in respect of such Casualty. If there has been a Casualty (whether a Material Casualty or any other Casualty) and the Closing occurs, the applicable Seller shall execute and deliver to Purchaser an assignment of such Seller's rights to all proceeds of any insurance policies covering such Casualty, plus the net proceeds (if any) actually collected by such Seller under the provisions of the casualty and other insurance policies covering the property damaged or destroyed by the Casualty; provided, however, that (x) the applicable Seller may alternatively elect to use such proceeds to repair the damage from the Casualty and (y) no such assignment shall be required for proceeds that relate to a Restaurant that was excluded from the Contemplated Transactions in accordance with this Section 11.4. This Section 11.4 and Section 14.4(i) sets forth Purchaser's sole and exclusive remedy in respect of any Casualty (including any Material Casualty), the Parties' respective rights and obligations being otherwise unaffected thereby.

12.    Break Up Fee; Expense Reimbursement.

12.1    Break-Up Fee. Sellers agree and acknowledge that Purchaser's negotiation and execution of this Agreement has required a substantial investment of management time and a significant commitment of resources by Purchaser, and that the negotiation and execution of this Agreement have provided value to Sellers and their respective bankruptcy estates. Therefore, on the terms and expressly subject to the conditions precedent set forth in this Section 12 and the Procedures Order, and as Purchaser's sole and exclusive remedy, Sellers shall pay or cause Purchaser to be paid cash in an amount equal to Fifty Thousand Dollars and 00/100 Cents as a break-up fee (the "*Break-Up Fee*"). This provision shall not be construed as a penalty, but as a bona fide attempt to establish an agreed upon measure of damages which Purchaser will suffer in the event that the Sellers close an Alternative Transaction.

12.2    <u>Payment of Break-Up Fee</u>.  Sellers' payment obligations under <u>Section 12.1</u> with respect to the Break-Up Fee shall be payable to Purchaser solely as and when the Sellers close an Alternative Transaction.

12.3    <u>Survival of Break-Up Fee</u>.  Sellers' obligation to pay and Purchaser's right to receive the Break-Up Fee in accordance with the terms and conditions of the Procedures Order shall survive the termination of this Agreement.

12.4    <u>Alternative Transaction</u>.  As used in this Agreement, the term "***Alternative Transaction***" means any agreement or transaction involving the sale (in a single transaction or a series of transactions) of all or substantially all of the Purchased Assets, or the issuance or sale (in a single transaction or a series of transactions) of all or substantially all of the equity interests of Sellers or any of their successors to any Person other than Purchaser or a designee of Purchaser that closes. No agreement or transaction will constitute an "Alternative Transaction" if this Agreement has been duly terminated under Section 14 (other than <u>Section 14.4(e)</u>) prior to the entry of such agreement or the closing of such transaction (respectively).

12.5    <u>Expense Reimbursement</u>.  Sellers shall reimburse Purchaser for Purchaser's reasonable, out-of-pocket expenses, in an amount not to exceed Twenty-Five Thousand and 00/100 Dollars ($25,000.00), if, and only if (a) Purchaser has duly terminated this Agreement under <u>Section 14.4(e)</u> and (b) Sellers have not consummated an Alternative Transaction within ninety (90) days after the effective date of such termination.

13.    <u>Employee Matters.</u>

13.1    <u>Employees</u>.  As of the Closing Date, Purchaser shall have the right, but not the obligation, to employ or engage as contractors any or all of the employees of Sellers whose job function primarily relates to the Business ("***Business Employees***") as Purchaser determines. Any Business Employees actually employed by Purchaser are referred to herein as "***Transferred Employees***." The terms of employment offered to any Business Employees shall be determined by Purchaser in its sole discretion and shall be contingent upon the issuance of the Sale Order by the Bankruptcy Court. As of the Closing, the employment of all of the Transferred Employees shall be terminated by Sellers.

13.2    <u>Employee Payroll Prior to Closing</u>.  Sellers will pay, in the ordinary course of business payroll practices, all obligations owed to the Business Employees through the day prior to the Closing Date for salary, wage, bonus, paid time off, benefits, overtime, Taxes, and other compensation or other amounts payable to or with respect to Business Employees. Sellers will be solely liable for all workers' compensation claims made by any of the Business Employees based on events or circumstances first occurring before the Closing Date.

13.3    <u>Employee Benefits Post-Closing</u>.  Beginning at 12:01 a.m. on the Closing Date, Purchaser will provide employee benefit coverage for all Transferred Employees under new or existing plans sponsored by Purchaser. Purchaser will provide credit under its new or existing plans for all Transferred Employees' compensated time-off that is due from Sellers as of the Closing Date. Sellers will remain solely liable, and Purchaser will not assume or otherwise have any Liabilities for, any contributions or benefits due with respect to any period prior to the Closing Date under any of Sellers' employee benefit plans.

13986776v5

13.4    <u>WARN Act</u>.  Sellers shall be solely liable for complying with the WARN Act and any and all comparable state law obligations (and for any failures to so comply); *provided, however,* that Purchaser shall be solely responsible for all Liabilities relating to or arising in connection with any actual, constructive or deemed termination of employment by Purchaser of any Transferred Employee after the Closing Date.

14.    <u>Termination</u>. This Agreement may be terminated prior to the Closing Date solely as set forth in this Section 14.

14.1    <u>Termination by Mutual Consent</u>.  This Agreement may be terminated at any time prior to the Closing Date by mutual written agreement of the Parties.

14.2    <u>Termination by Either Purchaser or Sellers</u>.    This Agreement may be terminated at any time prior to the Closing Date by either Purchaser or Sellers if any Governmental Body shall have issued an Order permanently restraining, enjoining or otherwise prohibiting the consummation of the Contemplated Transactions and such Order shall have become final and non-appealable. Any such Order that arises from the intentional breach of this Agreement (or other intentional misconduct or any violations of Legal Requirements) by the Purchaser or its Affiliates is referred to herein as a "***Purchaser Misconduct Order***".

14.3    <u>Termination by Sellers</u>. This Agreement may be terminated at any time prior to the Closing Date by Sellers solely as follows:

(a)    if there has been a material breach by Purchaser, which breach Purchaser has failed to cure within thirty (30) days following its receipt of written notice thereof from Sellers and which breach would cause the condition set forth in <u>Section 4.1(a)</u> not to be satisfied;

(b)    upon delivery of written notice to Purchaser, if any condition precedent of Sellers specified in <u>Section 4.1</u> shall not have been satisfied or waived and shall have become impossible to satisfy, unless the failure of such condition to have been satisfied was caused primarily by a material breach by Sellers.

(c)    if the Bankruptcy Court enters any Order approving any Alternative Transaction or confirming any Chapter 11 Plan involving any Alternative Transaction;

(d)    upon delivery of written notice to Purchaser, if the Closing Date shall not have occurred on or before 5:00 p.m. Central time on the Outside Date, but only to the extent the Closing has not occurred as of the Outside Date for reasons other than Sellers' failure to meet their obligations hereunder; or

(e)    if the Chapter 11 Cases shall be dismissed or converted to cases under Chapter 7 of the Bankruptcy Code, or if any trustee is appointed in the Chapter 11 Cases.

14.4    <u>Termination by Purchaser</u>. This Agreement may be terminated at any time prior to the Closing Date by Purchaser solely as follows:

(a)    upon delivery of written notice to Sellers, if the Procedures Order is not entered by the Bankruptcy Court by September 29, 2019;

(b)    upon delivery of written notice to Sellers, if the Sale Order is not entered by the Bankruptcy Court by October 18, 2019;

(c)    if there has been a material breach by a Seller, which breach such Seller has failed to cure within thirty (30) days following its receipt of written notice thereof from Purchaser and which breach would cause the condition set forth in <u>Section 4.2(a)</u> not to be satisfied;

(d)    upon delivery of written notice to Sellers, if any condition precedent of Purchaser specified in <u>Section 4.2</u> shall not have been satisfied or waived and shall have become impossible to satisfy, unless the failure of such condition to have been satisfied was caused primarily by a material breach by Purchaser.

(e)    if the Bankruptcy Court enters any Order approving any Alternative Transaction or confirming any Chapter 11 Plan involving any Alternative Transaction;

(f)    upon delivery of written notice to Sellers, if the Closing Date shall not have occurred on or before 5:00 p.m. Central time on the Outside Date, but only to the extent the Closing has not occurred as of the Outside Date for reasons other than Purchaser's failure to meet its obligations hereunder;

(g)    if the Chapter 11 Cases shall be dismissed or converted to cases under Chapter 7 of the Bankruptcy Code, or if any trustee is appointed in the Chapter 11 Cases;

(h)    upon delivery of written notice to Sellers, if for any reason Sellers are unable, or fail, to assume and assign to Purchaser at the Closing any of the Restaurant Leases (except to the extent (x) Purchaser elects in accordance with this Agreement that a Restaurant Lease will not constitute a Purchased Contract or (y) the Restaurant to which the Restaurant Lease relates is excluded from the Contemplated Transactions in accordance with <u>Section 11.4</u>);

(i)    in accordance with <u>Section 2.5(b)</u>; or

(i)    upon delivery of written notice to Sellers, if Sellers have delivered a Casualty Notice to Purchaser in respect of a Material Casualty (provided Purchaser delivers such written notice no later than five (5) days after the Sellers delivered such Casualty Notice).

14.5    <u>Effect of Termination</u>. In the event of termination by either Sellers or Purchaser of this Agreement pursuant to this <u>Section 14</u>, written notice thereof shall as promptly as practicable be given to the other Parties and thereupon this Agreement shall terminate and the Contemplated Transactions shall be abandoned without further action by the Parties hereto. Upon termination of this Agreement, (a) except as otherwise provided in this Agreement, this Agreement shall cease to have any force or effect, (b) the Parties shall not have any liability to each other, except for fraud occurring on or before the date of such termination; *provided, however,* that if this Agreement is duly terminated by reason of (i) any material breach hereof by the non-terminating Party or (ii) any material non-compliance by the non-terminating Party with its obligations under this Agreement, which non-compliance shall have been the cause of the failure of one or more of the conditions to the terminating Party's obligations to effect the Contemplated Transactions to have been satisfied, the terminating Party's right to pursue any available remedies at law will survive such termination unimpaired, (c) the Parties shall cease to have any further obligations under this Agreement except pursuant to <u>Sections 2.2</u>, <u>12</u>, <u>14.5</u>, <u>16.1</u> through <u>16.9</u>, and <u>16.11</u> through <u>16.19</u> (as such obligations are affected by any defined terms contained herein relating thereto), and (d) all filings, applications and other submissions made pursuant to the Contemplated Transactions shall, to the extent practicable, be withdrawn from the Governmental Body or Person to which made.

14.6    <u>Notification of Certain Events</u>. Sellers, on the one hand, and Purchaser, on the other hand, shall give written notice to the other(s) promptly upon becoming aware of any occurrence, or failure to occur, of any event, which occurrence or failure to occur has caused or could reasonably be expected to cause any condition to the obligations of the other(s) to effect the Contemplated Transactions not to be satisfied.

15.    <u>Post-Closing Matters.</u>

15.1    <u>Further Conveyances and Assumptions</u>.

(a)    From time to time following the Closing, and to the extent permitted by applicable Legal Requirements, Sellers shall make available to Purchaser such data in personnel records of Transferred Employees as is reasonably necessary for Purchaser to transition such employees into Purchaser's records.

(b)    From time to time following the Closing, Sellers and Purchaser shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquaintances and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and to assure fully to each of Sellers and its successors and assigns, the assumption of the liabilities and obligations intended to be assumed by Purchaser under this Agreement, and to otherwise make effective the Contemplated Transactions. For the avoidance of all doubt, nothing herein shall require Sellers to execute any document or take any action that would (i) impose or involve obligations or Liabilities on Sellers over and above those imposed on Sellers by the other provisions of this Agreement, (ii) involve any out-of-pocket cost or expense (individually or in the aggregate) that is in amount, or (iii) include joining or otherwise becoming a party to any action or proceeding of any kind.

(c)    From and after the Closing, Purchaser and Sellers shall reasonably cooperate in the transition of the Purchased Assets from Sellers to Purchaser, provided that neither Party shall be required to expend other than nominal unreimbursed costs in providing such cooperation.

(d)    The Sellers obligations under this Section 15.1 shall terminate on the two (2) year anniversary of the Closing.

15.2    <u>Reasonable Access to Records and Certain Personnel</u>. For a period of two (2) years following the Closing, (i) the Purchaser shall permit Sellers' counsel and other professionals and counsel for any successor to Sellers and their respective professionals (collectively, "***Permitted Access Parties***") reasonable access to the financial and other books and records relating to the Purchased Assets or the Business, which access shall include the right of such Permitted Access Parties to copy, at such Permitted Access Parties' expense, such documents and records as they may request in furtherance of the purposes described above, and (ii) Purchaser shall provide the Permitted Access Parties (at no cost to the Permitted Access Parties) with reasonable access during regular business hours to complete their post-Closing activities (including, without limitation, preparation of Tax Returns), provided that such access does not unreasonably interfere with the Purchaser's business operations.

23

15.3    Non-Competition. Each Seller hereby covenants to Purchaser that, from and after the Closing, each Seller shall not, directly or through a third party, develop, commercialize, license, or otherwise have an interest in any Competing Business in or for the Territory. This Section 15.3 shall survive the Closing for a period of five (5) years.

16.    Miscellaneous.

16.1    Attorneys' Fees. In the event that any Party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, each Party in that action or proceeding shall bear its own attorneys' fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees).

16.2    Notices. Unless otherwise provided herein, any notice, tender, or delivery to be given hereunder by any Party to the others shall be deemed effected upon personal delivery in writing, one Business Day after being dispatched by reputable overnight courier (*e.g.*, FedEx), postage prepaid, or in the case of delivery by facsimile, as of the date of facsimile transmission (with answer back confirmation of such transmission), or in the case of delivery by email, as of the date of the email transmission (with read-receipt enabled). Notices shall be addressed as set forth below, but each Party may change its address by written notice in accordance with this Section 16.2.

To Seller(s):

> 3155 Roswell Road, Suite 120
> Atlanta, GA 30305
> Attn: Ned Lidvall
> Email: nlidvall@gmail.com

With a copy to (which shall not constitute notice):

> Arnall Golden Gregory LLP
> 171 17th Street NW, Suite 2100
> Atlanta, GA 30363
> Attn: Sean P. Fogarty and Darryl S. Laddin
> Facsimile: 404.873.8151(Sean); 404.873.8121 (Darryl)
> Email: Sean.Fogarty@AGG.com; Darryl.Laddin@AGG.com

To Purchaser:
> Balu Holdings, LLC
> 11040 Hutchison Blvd
> Panama City Beach, FL 32407
> Attn: R.A. Spell
> Email: Rick@spellrestaurantgroup.com

With a copy to (which shall not constitute notice):

> Farris Bobango PLC
> 999 S. Shady Grove Road, Suite 500
> Memphis, Tennessee 38120
> Attn: John A. Bobango
> Email: jab@farris-law.com

Facsimile: 901-259-7130

16.3    <u>Entire Agreement</u>.    This Agreement and the documents to be executed pursuant hereto contain the entire agreement among the Parties relating to the subject matter hereof. Any oral or other agreements, representations or modifications concerning this Agreement or any such other document shall be of no force and effect excepting a subsequent modification in writing, signed by the Party to be charged.

16.4    <u>Modification</u>. This Agreement may be modified, amended or supplemented only by a written instrument duly executed by all the Parties hereto which expressly indicates the intention to modify, amend or supplement this Agreement.

16.5    <u>Severability</u>. Should any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive.

16.6    <u>Captions</u>. All captions, Section titles and headings contained in this Agreement are for convenience of reference only and shall be without substantive meaning or context of any kind whatsoever and shall not be construed to limit or extend the terms or conditions of this Agreement.

16.7    <u>Waiver</u>. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the Party making the waiver; *provided, however*, that the Consent of a Party to the Closing shall constitute a waiver by such Party of any condition precedent to Closing not satisfied as of the Closing Date.

16.8    <u>Payment of Fees and Expenses</u>. Except as provided in <u>Section 12</u> or otherwise herein, each Party to this Agreement shall be responsible for, and shall pay, all of its own fees and expenses, including those of its counsel, incurred in the negotiation, preparation and consummation of the Agreement and the Contemplated Transactions.

16.9    <u>Survival</u>. The covenants and agreements of Sellers and Purchaser herein, or in any certificates or other documents delivered prior to or at the Closing, shall not be deemed waived or otherwise affected by the Closing.

16.10    <u>Assignments</u>. This Agreement shall not be assigned by Sellers or Purchaser without the prior written consent of the other(s), which consent Purchaser or Sellers may grant or withhold in their respective sole and absolute discretion; *provided, however,* that Purchaser may assign or otherwise transfer any or all of its rights and interests hereunder to one or more affiliates, wholly owned subsidiaries, successors by consolidation, merger or operation of law, purchasers of all or substantially all of the Purchaser's assets or business or lenders of Purchaser as collateral (subject, in all instances to Purchaser's obligations under <u>Section 8.2</u> hereof). No assignment by any Party hereunder shall be deemed to in any way limit the assignor's liability or obligations hereunder.

16.11    <u>Binding Effect</u>. This Agreement shall bind and inure to the benefit of the respective heirs, personal representatives, successors, and permitted assigns of the Parties hereto.

16.12    <u>Applicable Law</u>. This Agreement shall be governed by and construed in accordance with the Bankruptcy Code and to the extent not inconsistent with the Bankruptcy Code, the law of the State of Georgia applicable to contracts made and performed in such State.

13986776v5

16.13   _Construction_. In the interpretation and construction of this Agreement, the Parties acknowledge that the terms hereof reflect extensive negotiations between the Parties and that this Agreement shall not be deemed, for the purpose of construction and interpretation, drafted by either Party hereto.

16.14   CONSENT TO JURISDICTION. THE PARTIES AGREE THAT THE BANKRUPTCY COURT SHALL BE THE EXCLUSIVE FORUM FOR ENFORCEMENT OF THIS AGREEMENT OR THE CONTEMPLATED TRANSACTIONS AND (ONLY FOR THE LIMITED PURPOSE OF SUCH ENFORCEMENT) SUBMIT TO THE JURISDICTION THEREOF; PROVIDED THAT IF THE BANKRUPTCY COURT DETERMINES THAT IT DOES NOT HAVE SUBJECT MATTER JURISDICTION OVER ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, THEN EACH PARTY (A) AGREES THAT ALL SUCH ACTIONS OR PROCEEDINGS SHALL BE HEARD AND DETERMINED IN A FEDERAL COURT OF THE UNITED STATES SITTING IN THE CITY OF ATLANTA, GEORGIA, (B) IRREVOCABLY SUBMITS TO THE JURISDICTION OF SUCH COURTS IN ANY SUCH ACTION OR PROCEEDING, (C) CONSENTS THAT ANY SUCH ACTION OR PROCEEDING MAY BE BROUGHT IN SUCH COURTS AND WAIVES ANY OBJECTION THAT SUCH PARTY MAY NOW OR HEREAFTER HAVE TO THE VENUE OR JURISDICTION OR THAT SUCH ACTION OR PROCEEDING WAS BROUGHT IN AN INCONVENIENT COURT, AND (D) AGREES THAT SERVICE OF PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY BE EFFECTED BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL), POSTAGE PREPAID, TO SUCH PARTY AT ITS ADDRESS AS PROVIDED IN SECTION 16.2 (PROVIDED THAT NOTHING HEREIN SHALL AFFECT THE RIGHT TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY GEORGIA LAW).

16.15   _Counterparts_. This Agreement may be signed in counterparts. The Parties further agree that this Agreement may be executed by the exchange of facsimile or electronic pdf signature pages provided that by doing so the Parties agree to undertake to provide original signatures as soon thereafter as reasonable in the circumstances.

16.16   _Non-Recourse_. No past, present or future member, manager, officer, employee, or incorporator of Sellers or Purchaser shall have any liability for any obligation or Liability of Sellers or Purchaser, as the case may be, under this Agreement or for any claim, counter-claim, cause of action or demand based on, in respect of, or by reason of, the Contemplated Transactions, except for any claim against any Person based on the fraud of such Person in connection with any representations of Sellers or Purchaser hereunder, as the case may be.

16.17   _Time is of the Essence_. Time is of the essence in this Agreement, and all of the terms, covenants and conditions hereof.

16.18   _Interpretation and Rules of Construction_. In this Agreement, except to the extent that the context otherwise requires:

(a)    when a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference is to an Article or Section of, or an Exhibit or a Schedule to, this Agreement unless otherwise indicated;

(b)    the headings and captions used in this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

(c)    whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

(d)    the words "hereof," "herein" and "hereunder" and works of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement;

(e)    all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

(f)    the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms;

(g)    any law defined or referred to herein or in any agreement or instrument that is referred to herein means such law or statute as from time to time amended, modified or supplemented, including by succession of comparable successor laws;

(h)    references to a person are also to its permitted successors and assigns; and

(i)    the use of "or" is not intended to be exclusive unless expressly indicated otherwise.

16.19    <u>Third Party Beneficiaries</u>. This Agreement is intended to be solely for the benefit of the Parties hereto and is not intended to confer, and shall not be deemed to confer, any benefits upon, or create any rights in or in favor of, any Person other than the Parties hereto, and their respective permitted assigns.

17.    <u>Definitions</u>. In addition to the other terms defined elsewhere in this Agreement, for the purposes of same, the following words and terms shall have the meaning set forth below (such meanings being equally applicable to both the singular and plural form of the terms defined). The exhibits and schedules referenced in this <u>Section 17</u> and throughout the Agreement are deemed to be part of the Agreement and are incorporated herein by reference.

"***Acquired Restaurant***" means those restaurants which are operated at the premises leased pursuant to a Restaurant Lease that constitutes a Purchased Contract.

"***Affiliate***" of a Person means a Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, the first-mentioned Person. For purposes of this definition, "control," when used with respect to any specified Person, means the power to direct or cause the direction of the management and policies of such Person, directly or indirectly, whether through ownership of voting securities or by contract or otherwise, and the terms "controlling" and "controlled by" have meanings correlative to the foregoing.

"***Agreement***" shall have the meaning provided for in the preamble.

"***Allocation Schedule***" shall have the meaning provided for under <u>Section 2.7</u>.

"***Alternative Transaction***" shall have the meaning ascribed to such term in <u>Section 12.4</u> above.

"*Assignment of Restaurant Leases*" shall have the meaning provided for under Section 3.2(a).

"*Assignment of Intangible Property Assets*" shall have the meaning provided for under Section 3.2(c).

"*Assignment of Other Contracts*" shall have the meaning provided for under Section 3.2(b).

"*Assumed Liabilities*" shall have the meaning provided for under Section 2.3.

"*Assumption of Liabilities*" shall have the meaning provided for under Section 3.3(h).

"*Auction*" shall have the meaning provided for under Section 9.1.

"*Avoidance Action*" means all preference or avoidance claims and actions of Sellers, including, without limitation, any such claims and actions arising under Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code and any other affirmative Claim of Sellers against third parties, including, without limitation, any Claims arising under non-bankruptcy law.

"*Bankruptcy Code*" shall have the meaning provided for under Preliminary Statement B.

"*Bankruptcy Court*" shall have the meaning provided for under Preliminary Statement B.

"*Bill of Sale*" shall have the meaning provided for under Section 3.2(d).

"*Break-Up Fee*" shall have the meaning provided for under Section 12.1.

"*Business*" shall have the meaning provided for under Preliminary Statement A.

"*Business Day*" means any day other than a Saturday or Sunday or a legal holiday on which banks in Tennessee are closed.

"*Business Employees*" shall have the meaning provided for under Section 13.1.

"*Business Permit*" means any business permit, license, certificate of occupancy, registration, certificate of public convenience and necessity, approval, easement, authorization or operating right issued or granted by any Governmental Body having jurisdiction over the Business.

"*Cash Purchase Price*" shall have the meaning provided for under Section 3.3(a).

"*Casualty*" shall have the meaning provided for under Section 11.4.

"*Casualty Notice*" shall have the meaning provided for under Section 11.4.

"*Chapter 11 Cases*" shall have the meaning provided for under Preliminary Statement B.

"*Claim*" means any claim, cause of action, right of recovery, right of set-off, and right of recoupment of every kind and nature including but not limited to prepayments, warranties, guarantees, refunds, reimbursements.

"*Closing*" shall have the meaning provided for under Section 3.1.

13986776v5

"***Closing Date***" shall have the meaning provided for under <u>Section 3.1</u>.

"***Code***" means the Internal Revenue Code of 1986, as amended.

"***Competing Business***" means any similar business that provides goods and services similar to what the Acquired Restaurants provide as of the Effective Date in any form, including another Latin inspired cuisine restaurant or any other type of full-service restaurant.

"***Consent***" means any consent, approval, authorization, affirmative vote, waiver, agreement or license by, or report or notice to, any Person.

"***Contemplated Transactions***" shall have the meaning provided for under <u>Preliminary Statement C</u>.

"***Contract***" means any executory contract or unexpired lease within the meaning of the Bankruptcy Code.

"***Copyright***" means all copyrightable works, and all United States and foreign registered copyrights and applications, registrations and renewals therefor, and any past, present or future claims or causes of actions arising out of or related to any infringement or misappropriation of any of the foregoing.

"***Cure Costs***" means the amounts required to be paid as cure amounts under Section 365 of the Bankruptcy Code so that Sellers may sell, assume and assign the Purchased Contracts to Purchaser.

"***Cure Costs Cap***" shall have the meaning provided for under <u>Section 2.5(a)</u>.

"***Cure Costs Election Notice***" shall have the meaning provided for under <u>Section 2.5(b)</u>.

"***Deposit***" shall have the meaning provided for under <u>Section 2.1(b)</u>.

"***Documents***" shall have the meaning provided for under <u>Section 1.1(i)</u>.

"***Domain Name***" means the internet domain names owned by Sellers, and all registrations, applications and renewals related to the foregoing.

"***Effective Date***" shall have the meaning provided for in the preamble.

"***Encumbrance***" means any claim, lien, pledge, option, charge, easement, Tax assessment, security interest, deed of trust, mortgage, right-of-way, encroachment, building or use restriction, conditional sales agreement, encumbrance or other right of third parties of any sort whatsoever, whether voluntarily incurred or arising by operation of law, and includes any agreement to give any of the foregoing in the future, and any contingent sale or other title retention agreement or lease in the nature thereof.

"***Entity***" means any corporation (including any nonprofit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, cooperative, foundation, society, political party, union, company (including any limited liability company or joint stock company), firm or other enterprise, association, organization or entity.

"***Escrow Holder***" shall have the meaning provided for under <u>Section 2.1</u>.

"***Excluded Assets***" shall have the meaning provided for under <u>Section 1.2</u>.

"*Excluded Contract*" means any Sellers' Contract that is not a Purchased Contract.

"*Excluded Liability*" shall have the meaning provided for under <u>Section 2.4</u>.

"*Excluded Petty Cash*" means, collectively, any petty cash of Sellers (i) on the premises of any of the Acquired Restaurants in excess of $700, and (ii) on any premises or at any location that is not an Acquired Restaurant.

"*Furniture and Equipment*" means, to the extent located at, forming part of, or used primarily in connection with an Acquired Restaurant, all fixtures and other Leasehold Improvements, counters, point of service systems ("*POS*"), manager work stations ("*MWS*"), training work stations ("*TWS*") hoods, washers, disposal systems, ovens, grills, fryers, refrigeration units, artwork, racks, stands, displays, counters, desks, chairs, tables, dispensers, and other furniture and furnishings, hardware, vehicles, tools, small ware, and other equipment (copiers, fax machines, telephone lines and numbers, computers, printers, and other telecommunication equipment), and miscellaneous office and store supplies and other items of tangible personal property owned or used by Sellers in the conduct of the Business. As used herein, the "Furniture and Equipment" does not include any tangible property held by Sellers pursuant to a Contract where Purchaser does not assume at the Closing the underlying Contract relating to such property.

"*Gift Certificates*" means any gift certificates, gift cards, or food/beverage credits that were issued by Seller prior to the Closing Date and are required to be honored by Sellers in the ordinary course of business.

"*Good Funds*" shall have the meaning provided for under <u>Section 2.1(b)</u>.

"*Governmental Body*" means any: (a) nation, principality, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature; (b) federal, state, local, municipal, foreign or other government; (c) governmental or quasi-governmental authority of any nature (including any governmental division, subdivision, department, agency, bureau, branch, office, commission, council, board, instrumentality, officer, official, representative, organization, unit, body or Entity and any court or other tribunal); (d) multinational organization or body; or (e) individual, Entity or body exercising, or entitled to exercise, any executive, legislative, judicial, administrative, regulatory, police, military or taxing authority or power of any nature. Notwithstanding the foregoing, no individual or Entity referenced in clauses (c)-(e) of this definition will be considered a "Governmental Body" for purposes of this definition unless the rules, regulations or promulgations thereof have the force of law thereof.

"*Indebtedness*" shall mean and include (i) all obligations for borrowed money, (ii) all obligations evidenced by bonds, debentures, notes or other similar instruments, (iii) all obligations to pay the deferred purchase price of property or services (other than accounts payable and accrued expenses), (iv) all obligations with respect to capital leases, (v) all obligations created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person, (vi) all non-contingent reimbursement and other payment obligations in respect of letters of credit and similar surety instruments (including construction performance bonds, but not contingent obligations in respect of letters of credit and similar surety instruments (including construction performance bonds)), and (vii) all guaranty obligations with respect to the types of obligations listed in clauses (i) through (vi) above.

"*Intangible Property Assets*" means any Intellectual Property Assets or Other Intangible Property Assets owned or held by Sellers. As used in this Agreement, "Intangible Property Assets" shall in all events exclude: (i) any materials containing information about employees to the extent disclosure of which is prohibited under applicable Law, and (ii) any software or other item of intangible property held by Sellers

pursuant to a license or other Contract where Purchaser does not assume the underlying Contract relating to such software or item of intangible personal property at the Closing.

"*Intellectual Property Assets*" means intellectual property or other proprietary rights of Sellers of every kind throughout the world, both domestic and foreign, which, in each case, are related to the Business, including all inventions and improvements thereon, Patents, Trademarks, Trademark Rights, Copyrights, Domain Names, Technology, Recipes and trade secrets.

"*Inventory*" means all food, all supplies, goods, finished goods, materials, raw materials, work in process, perishable inventory and stock in trade owned by any Seller, whether or not prepaid, and wherever located, held or owned, including all fresh and frozen foodstuffs, alcoholic beverages, non-alcoholic beverages, disposable paper goods (such as napkins and paper towels), soaps and detergents, condiments, retail merchandise, replacement and spare parts and fuels and other similar items owned and held by Sellers or used in connection with the Acquired Restaurants, wherever located.

"*Large Party Deposit*" means any cash deposit, prepayment, down-payment, or reservation fee made to Sellers in connection with a Large Party Reservation.

"*Large Party Reservation*" means a reservation for space, food, beverage, and associated service for any party larger than 12 people at any Acquired Restaurant made with the payment of a Large Party Deposit for a date and time after the Closing Date including, for example, a large family party or gathering, a corporate party or function, or a similar group function planned in advance.

"*Leasehold Improvements*" means any leasehold improvements or appurtenances to such improvements (including, without limitation, buildings, structures, storage areas, driveways, walkways, planters, landscaping and parking areas).

"*Legal Requirement*" means any applicable federal, state, local, municipal, foreign or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, proclamation, treaty, convention, rule, regulation, directive, pronouncement, requirement, notice requirement, guideline, Order, specification, determination, opinion or interpretation issued, enacted, adopted, passed, approved, promulgated, made, implemented or otherwise put into effect by or under the authority of any Governmental Body. Notwithstanding the foregoing, no such proclamation, convention, directive, pronouncement, guideline, specification, determination, opinion or interpretation, shall be considered a "Legal Requirement" for purposes of this definition unless the same is mandatory and has the force of law.

"*Liability*" means any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty or endorsement of any type whatsoever, whether accrued or unaccrued, absolute or contingent, matured or unmatured, liquidated or unliquidated, known or unknown, asserted or unasserted, due or to become due.

"*Liquor Inventory*" means the Sellers' interest in the inventory of beer, wine and liquor at all of the Restaurants, as determined on the applicable date.

"*Liquor License*" means all liquor licenses (including, without limitation, beer and wine licenses) held or used by a Seller in the operation of the Business.

"*Liquor License Approval*" shall have the meaning provided for under Section 8.1.

"*Management Agreement*" means the agreement substantially in the form attached as Exhibit A.

13986776v5

"*Material Casualty*" shall have the meaning provided for under Section 11.4.

"*Order*" means any judgment, decision, consent decree, injunction, ruling or order of any Governmental Body that is binding on any Person or its property under applicable law.

"*Other Contract*" means any Sellers' Contract other than the Restaurant Leases.

"*Other Intangible Property Assets*" means all intangible personal property (other than the Intellectual Property Assets) owned or held by Sellers, including, without limitation, (A) the books and records pertaining to the Business; (B) proprietary information relating to the Business, including but not limited to catalogues, customer lists and other customer data bases, correspondence with present or prospective customers and suppliers, advertising materials, software programs, and telephone numbers identified with the Business; and (C) all goodwill of the Business.

"*Outside Date*" means October 27, 2019.

"*Parties*" shall have the meaning provided for in the preamble.

"*Patent*" means the United States and foreign patents and patent applications owned by Sellers, including any continuations, divisionals, continuations in part, or reissues of patent applications and patents issuing thereon and any past, present or future claims or causes of action arising out of or related to any infringement or misappropriation of any of the foregoing.

"*Permitted Access Parties*" shall have the meaning provided for under Section 15.2.

"*Permitted Encumbrances*" means (a) statutory landlord Encumbrance, (b) in the case of any Restaurant Lease, zoning, building, or other restrictions, variances, exceptions, reservations, limitations, covenants, rights of way, encumbrances, easements and other irregularities in title of public record on real property that do not materially detract from the value of the affected Acquired Restaurants and do not materially interfere with the present or intended use of such Acquired Restaurants and (c) Encumbrances that will be released by the Sale Order.

"*Person*" means an individual, Entity or Governmental Body.

"*Petition*" means the petitions that commenced the Chapter 11 Cases.

"*Petition Date*" means July 30, 2019.

"*Previously Omitted Contract*" shall have the meaning provided for under Section 2.6(b)(i).

"*Previously Omitted Contract Designation*" shall have the meaning provided for under Section 2.6(b)(i).

"*Previously Omitted Contract Notice*" shall have the meaning provided for under Section 2.6(b)(ii).

"*Procedures Order*" shall have the meaning provided for under Section 9.1.

"*Purchase Price*" shall have the meaning provided for under Section 2.1.

"*Purchased Assets*" shall have the meaning provided for under Section 1.1.

"***Purchased Contract***" is defined in <u>Section 1.1(f)</u> hereof. Notwithstanding anything in <u>Section 1.1(f)</u> to the contrary, a Contract shall not constitute a "Purchased Contract" if Purchaser removes such Contract from Schedule 1.1(f) as provided in <u>Section 1.3(b)</u>.

"***Purchased Intellectual Property***" shall have the meaning provided for under <u>Section 1.1(l)</u>.

"***Purchaser***" shall have the meaning provided for in the preamble.

"***Purchaser Misconduct Order***" shall have the meaning provided for under <u>Section 14.2</u>.

"***Receivables***" means all accounts receivable (whether current or non-current) (whether billed or unbilled) of the Business attributable to the operation of the Acquired Restaurants as of the Closing, even if such accounts receivable become due and payable after the Closing, and all causes of action specifically pertaining to the collection of the foregoing.

"***Recipes***" means all of Sellers' recipes, methods, procedures, cooking/ preparation/mixing publications, guidelines, or standards, knowhow, ingredient lists, menus, price lists, nutritional, health, or dietary information, publications, or disclosures, and promotional or informational materials, in each case whether related to food, beverages (whether alcoholic or non-alcoholic), or otherwise (in each case, written or oral or in any other form whatsoever).

"***Restaurants***" shall have the meaning provided for under <u>Preliminary Statement A</u>.

"***Restaurant Lease***" means any real property lease of any of the Sellers set forth on <u>Schedule 1.1(f)</u> under which an Acquired Restaurant is included on the premises leased thereunder, together with all rights and interests of Sellers relating thereto, whether held directly by Sellers or indirectly through an agent or nominee (including but not limited to all security deposits, purchase options, renewal options, rights of first refusal, reconveyance rights and expansion rights, if any, fixtures, systems, equipment and items of personal property of Sellers attached or appurtenant thereto, all Leasehold Improvements thereon or forming a part thereof and all easements, licenses, rights and appurtenances thereto and associated with such Restaurant Lease).

"***Restaurant Petty Cash***" shall mean petty cash of Sellers on the premises of any Acquired Restaurant, other than Excluded Petty Cash.

"***Sale Hearing***" shall have the meaning provided for under <u>Section 9.1</u>.

"***Sale Motion***" shall have the meaning provided for under <u>Section 9.1</u>.

"***Sale Order***" shall have the meaning provided for under <u>Section 9.1</u>.

"***Sellers***" shall have the meaning provided for in the preamble.

"***Sellers' Contract***" means any Contract (a) to which any of Sellers is a party or by which any of Sellers is bound and (b) that is related to the Business.

"***Sellers' Knowledge***" means the actual knowledge of the Chief Executive Officer or the Chairman of the Board of the Sellers.

33

"***Standard Exceptions to Enforceability***" means any bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer or other laws (whether statutory, regulatory or decisional), now or hereafter in effect, relating to or affecting the rights of creditors generally or by equitable principles (regardless of whether considered in a proceeding at law or in equity).

"***Subsidiary***" means, with respect to any Person, (a) any corporation of which at least 50% of the securities or interests having, by their terms, ordinary voting power to elect members of the board of directors, or other persons performing similar functions with respect to such corporation, is held, directly or indirectly by such Person and (b) any partnership or limited liability company of which (i) such Person is a general partner or managing member or (ii) such Person possesses a 50% or greater interest in the total capitalization or total income of such partnership or limited liability company.

"***Tax***" means any federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"***Tax Return***" means any return, declaration, report, claim for refund, transfer pricing report or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"***Technology***" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, know how, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology.

"***Territory***" means the area within a radius of ten (10) miles of an Acquired Restaurant.

"***Trademarks***" means all trademark registrations and applications for trademark registration owned by Sellers, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof, and any past, present or future claims or causes of action arising out of or related to any infringement or misappropriation of any of the foregoing.

"***Trademark Rights***" means all common law rights in the United States and any foreign jurisdiction in any trade names, corporate names, logos, slogans, designs, trade dress, and unregistered trademarks and service marks owned by Sellers, together with all translations, adaptations, derivations and combinations thereof, and the goodwill associated with any of the foregoing.

"***Transfer Taxes***" shall have the meaning provided for under Section 3.4.

"***Transferred Employee***" shall have the meaning provided for under Section 13.1.

"***Utilities***" shall have the meaning provided for under Section 2.8.

"***WARN Act***" means the United States Worker Adjustment and Retraining Notification Act, and the rules and regulations promulgated thereunder, or any formulation of similar rights arising under applicable state law.

13986776v5

*[SIGNATURE PAGES FOLLOW; PAGE INTENTIONALLY LEFT BLANK]*

35

[*Signature Page – Asset Purchase Agreement*]

IN WITNESS WHEREOF, Purchaser and Sellers have executed this Agreement as of the day and year first above written.

**PURCHASER:**

**Balu Holdings, LLC.**
a Delaware limited liability company

By: _____

Name: F. M. Sue II

Its: President

*[Signature Page – Asset Purchase Agreement]*

IN WITNESS WHEREOF, Purchaser and Sellers have executed this Agreement as of the day and year first above written.

**SELLERS:**

**Eat Here Brands LLC,**
a Delaware limited liability company

By:
Name: Ned Lidvall
Its: Chief Executive Officer

**Babalu Knoxville #1, LLC,**
a Tennessee limited liability company

By:
Name: Ned Lidvall
Its: Chief Executive Officer

**Babalu Birmingham #1, LLC,**
an Alabama limited liability company

By:
Name: Ned Lidvall
Its: Chief Executive Officer

**Babalu, LLC,**
a Mississippi limited liability company

By:
Name: Ned Lidvall
Its: Chief Executive Officer

**Babalu Atlanta #1 LLC,**
a Georgia limited liability company

By:
Name: Ned Lidvall
Its: Chief Executive Officer

**Babalu Memphis #1, LLC,**
a Tennessee limited liability company

By:
Name: Ned Lidvall
Its: Chief Executive Officer

**Babalu Memphis #2 LLC,**
a Tennessee limited liability company

By:
Name: Ned Lidvall
Its: Chief Executive Officer

## **Exhibit A**

Form of Management Agreement

(See attached)

FORM OF

**INTERIM BEVERAGE MANAGEMENT AGREEMENT**

This Interim Beverage Management Agreement (this "*Agreement*") is dated and effective as of October [●], 2019 ("*Effective Date*"), by and between **[Name of Debtor]**, a [●] limited liability company ("*Licensee*") and Balu Holdings, LLC, a Delaware limited liability company ("*Owner*").

**Preliminary Statements**

A.  Licensee has heretofore conducted wine, beer and retail beverage sales within the restaurant known as "*Babalu*" located at **[Address of Restaurant]** (the "*Restaurant*") and has been issued one or more licenses and permits, including, but not limited to those set forth on **Schedule I** authorizing Licensee to sell and serve distilled spirits, wine, malt beverages liquor, high gravity beer and beer at the Restaurant ("*Licensee Permits*").

B.  Concurrently with the execution and delivery of this Agreement, the Restaurant is being sold, assigned and transferred by Licensee, as seller, to Owner, as purchaser, pursuant to that certain Asset Purchase Agreement by and among Licensee, Owner and the other parties thereto (the "*APA*") dated September 9, 2019 (the "*APA Date*"), and this Agreement is executed in an effort to prevent an interruption in retail beverage service and allow Owner ample time to obtain new retail beverage service licenses for the Restaurant.

C.  Therefore, Owner desires for Licensee to continue operation of the beverage service and all activities necessary or incidental thereto as previously conducted immediately prior to the sale to Owner, pending issuance to Owner of all licenses necessary to operate the beverage service at the Restaurant ("*Beverage Operations*").  The phrase "*beverage service*" includes the sale and service of alcoholic beverages (distilled spirits, wine, malt beverages liquor, high gravity beer and beer) as permitted under the applicable licenses issued by the **[State]'s [Division of Alcoholic Beverages and Tobacco**] ("*DABT*").

NOW THEREFORE, in consideration of the mutual promises and covenants herein contained, Licensee and Owner, intending to be legally bound, hereby agree as follows:

1.  **Preliminary Statements**. The preliminary statements set forth above are true and correct and are hereby incorporated by reference into this Agreement as if the same were fully set forth herein.

2.  **Filing of Application(s).**  Immediately following the APA Date, Owner or its designee has commenced all actions required to obtain new licenses necessary to operate the Beverage Operations in its own name, diligently pursue the same and has used commercially reasonable efforts to complete the application process in a timely manner.

3.  **Licensee's Permits**.  Licensee shall use its best efforts to keep its licenses and permits for the Beverage Operations in full force and effect and in good standing for the duration of the Term (as hereinafter defined).  Copies of the permits and licenses for the Beverage Operations of Licensee are set forth on **Schedule I** annexed hereto and made a part hereof ("*Permits*"). During the Term, Licensee shall retain all ownership and control of its Permits. Notwithstanding anything contained herein to the contrary, Owner acknowledges that Licensee has made no representations with respect to its Permits or the alcoholic beverage inventory at the Restaurant and that it is accepting the rights granted herein without any representations by Licensee.

4.     **Management**.  Owner hereby grants unto Licensee the sole and exclusive right to continue to provide the Beverage Operations and full access to the Restaurant at all times.  At all times during the Term, Licensee and Owner shall comply with all federal, state and local laws concerning the purchase, storage, distribution, possession, transportation and sale of alcoholic beverages, and shall be responsible for any and all citations arising therefrom. Without limiting the generality of any term herein, Licensee shall perform the Beverage Operations in a good faith and highly professional manner and shall at all times act with the standard of skill, care and expertise that would be customary and reasonably expected from a prudent manager of comparable Beverage Operations. All duties to be performed by Licensee under this Agreement shall be for and on behalf of Owner, in the name of Owner, and for Owner's account, and none of such duties are to be performed at Licensee's expense. Without limiting Licensee's exclusive right and authority to conduct the Beverage Operations, in providing its services hereunder, Owner shall without limitation provide the following on behalf of Licensee:

(a)     Inventory and Supplies. Owner shall provide, at its sole cost and expense, during the Term all operating equipment and supplies (including glassware and other supplies, "*Operating Supplies*") necessary for Licensee to manage the Beverage Operations in a professional manner consistent with the management of restaurants of a quality and type similar to the Restaurant.   During the Term, Owner shall purchase alcohol beverage inventory ("*Beverage Inventory*") from accounts with liquor wholesalers in Licensee's name, which shall be paid from accounts owned by Owner.  During the Term, Licensee shall be deemed (pursuant to the power and authority retained by Licensee) to exercise the ownership and control over all Beverage Inventory and Beverage Operations at the Restaurant.

(b)     Fixtures and Equipment: Maintenance; Surrender. Owner shall, at its sole cost and expense, provide all fixtures, equipment, furnishings, and furniture necessary for the Beverage Operations in a manner consistent with the management of restaurants of a quality and type similar to the Restaurant.

5.     **Liquor Employees.**  "*Liquor Employees*" means bar managers, bartenders, bar-backs, cocktail servers and other employees of the Owner who are dedicated to the Beverage Operations. The Liquor Employees are, and at all times during the Term will be, employees of the Owner and not of Licensee. Notwithstanding the foregoing, during the Term, the Owner delegates to Licensee and agrees that Licensee shall have, subject to the terms of this Agreement, the exclusive responsibility and authority to direct the selection, control, promotion, discipline, and discharge of all Liquor Employees in accordance with applicable laws and the Restaurant policies and procedures in effect from time to time. Owner shall be solely responsible for the compensation, including, but not limited to, salary, bonuses, benefits, PTO, insurance and taxes for any Liquor Employees.

6.     **Inspection of Beverage Operations**. Owner, any unaffiliated third person lenders, and their respective representatives may, at all reasonable times, enter in and upon the areas in which the Beverage Operations are being conducted to examine the condition thereof and to observe the Beverage Operations.

7.     **Expense Reimbursement**.  Owner agrees that all fees, costs and expenses incurred by Licensee in connection with this Agreement, provision of the services contemplated hereunder or in connection with any license or permit relating to the Beverage Operations (including without limitation, any renewal or extension of such license or permits) shall be promptly paid by or reimbursed by Owner.

8.     **Management Fee**.  In consideration of Licensee's performance of its obligations under this Agreement, Owner shall pay to Licensee for the management of Beverage Operations a fee equal to Ten and 00/100 U.S. Dollars ($10.00) for each thirty (30)-day period (each, a "*Period*") of the Term (the

"*Management Fee*"), payable within five (5) business days after the earlier of the final day of the applicable Period or the termination of the Agreement, which amount shall be prorated for any partial Period.

9.      **Term and Transition**.

(a)      <u>Term</u>. This Agreement shall commence as of the effective date first above written and continue until the earlier of (i) 90 calendar days from the effective date of this Agreement or (ii) until all permits to serve beer and liquor at the Restaurant have been issued to Owner ("***Term***").  In the event Owner believes that all permits to serve beer and liquor at the Restaurant will not be issued to Owner within 90 calendar days from the effective date of this Agreement, Owner may, within seven (7) calendar days prior to the expiration of the 90 day term, request in writing to Licensee that Licensee consent to the extension of the Term for additional 45 days, and such consent shall not be unreasonably withheld or delayed.

(b)      <u>Transition Cooperation</u>. Upon the termination or expiration of this Agreement, Licensee will take reasonable steps for the orderly transition of management of the Beverage Operations to Owner or its designee(s) pursuant to a transition plan mutually agreed upon by Owner and Licensee. With respect to any termination of this Agreement, Owner and Licensee will negotiate towards a transition plan in good faith and in a manner that is reasonable in light of the circumstances of such termination and which provides for the continuance of Beverage Operations at the Restaurant. The transition plan shall be implemented for period that is reasonable in light of the circumstances of such termination.

10.     **Accounting**.  On behalf of Licensee, Owner shall deposit in any bank insured by the Federal Deposit Insurance Corporation (FDIC), all monies received by Owner on behalf of Licensee relating to Beverage Operation.  On behalf of Licensee, Owner shall disburse and pay monies in such amounts and at such times as the same are required to be made in connection with:

(a)      All federal and state taxes, assessments and charges of every kind imposed by any governmental agency relating to the purchase and sale of beer and alcoholic beverages at the Restaurant that become due and payable during the Term, unless payment is in good faith being contested by Licensee and enforcement thereof is stayed.  All taxes shall be remitted under tax identification numbers issued to Licensee;

(b)      All costs and expenses of purchasing beer and alcoholic beverages for sale at the Restaurant;

(c)      Insurance premiums, professional fees, management fees and all reimbursements or other payments due pursuant to the provisions of this Agreement;

(d)      All other budgeted items of expense.

Licensee shall not be responsible for any expenses, obligations or liabilities arising from or relating to the Beverage Operations from and after the date hereof. Owner shall, as a part of its services under this Agreement, in a timely manner pay all expenses incurred in operating the Beverage Operations, including but not limited to, any and all purchases of the Beverage Inventory and any and all taxes associated with the Beverage Operations, from the revenues and receipts Owner collects. In the event that expenses exceed revenues and receipts, Owner shall have the obligation or liability for such shortfall, and Licensee shall have no obligation or liability for the shortfall.

11.     **Books and Records**. Owner on behalf of Licensee shall arrange for the keeping of full and adequate books of account and other records necessary to reflect the results of the operation of food and beverage service of the Restaurant.  The books of account shall be kept, in all material respects, in accordance with generally acceptable accounting practices for Restaurant.  The books of account and all of the records relating to, or reflecting the operation of, the Beverage Operations of the Restaurant shall be kept at the Restaurant and shall be available to Licensee and Owner at all reasonable times for examination, inspection and copying.  Upon termination of this Agreement, all books and records (or copies thereof) shall be promptly turned over to Owner, to ensure the orderly continuance of the Beverage Operations of the Restaurant.  The books and records of food and beverage service of the Restaurant through the date of termination of this Agreement shall be available to Licensee and Owner at all reasonable times for inspection, examination and copying, and Licensee shall be entitled to retain a copy for its records upon termination of this Agreement.

12.     **Legal proceedings**.  Each party shall have the right to institute and defend in any legal actions or proceedings relating to matters arising out of the service of beer and/or alcoholic beverages at the Restaurant.

13.     **Default**.  This Agreement may be terminated by either party, at its option, immediately upon the failure of either party to perform, keep or fulfill any of the covenants, undertakings, obligations or conditions set forth in this Agreement, and the continuance of such default for a period of ten (10) days after written notice is given by the other party specifying said failure.

14.     **Notices**. All notices that are required or permitted hereunder shall be in writing and shall be sufficient if personally delivered or sent by registered or certified mail, facsimile message, or Federal Express or other nationally recognized overnight delivery service.  Any notices shall be deemed given upon the earlier of the date when received at, or the third day after the date when sent by registered or certified mail or the day after the date when sent by Federal Express or other nationally recognized overnight delivery service or facsimile to the address or facsimile number set forth below, unless such address or facsimile number is changed by written notice to the other parties in accordance with this Agreement:

> For Licensee:   [Name of Debtor], LLC
> _____
> Attention: [●]
>
> For Owner:   Balu Holdings, LLC
> [Address of Purchaser]
> Attention: R. A. Spell

15.     **Indemnification and Insurance.**

(a)     Owner ("***Indemnifying Party***") shall indemnify, defend, and hold harmless Licensee and its agents, officers, directors, shareholders, parents, subsidiaries and affiliates (individually "***Indemnitee***" or collectively, "***Indemnitees***") from any and all liabilities, damages, or claims, costs, unpaid operating expenses, penalties, citations, enforcement actions, losses, or expenses of every kind and description, including allegations of negligence by Indemnitees and including reasonable attorneys' fees (collectively, "***Damages***"), sustained or incurred by any of the Indemnitees to the extent that such Damages arise from or are related to (i) any matter arising out of or related to this Agreement, (ii) the use of the existing liquor licenses, (iii) Beverage Operations,  (iv) the operation of the food and beverage facilities on the Restaurant, (v) the employment or use of any employee, agent, or independent contract by the Owner, and (vi) any

action or inaction by any entity or person on or in either the Restaurant or any property owned, leased, or under the exclusive or shared control of the Indemnifying Party, from and after the date hereof, except to the extent such Damages arise from the gross negligence or willful misconduct of Licensee.

(b)     This defense, indemnity and hold harmless agreement shall not apply to any liability arising from any act or omission of Licensee prior to the Effective Date.

(c)     Upon discovery by any Indemnifying Party of facts giving rise to a claim for indemnity under the provisions of this Agreement ("*Claim*"), including receipt of notice of any demand, assertion, claim, action or proceeding, judicial or otherwise by any person or entity, the Indemnifying Party will give prompt notice thereof in writing to Licensee.  Upon receipt of such notice, Indemnitees shall make written demand for indemnification under this Agreement.

(d)     Indemnitees shall have the right, through counsel of their choice, subject to the terms and conditions of Indemnifying Parties' insurance policies then in effect and Indemnifying Parties' approval, not to be unreasonably withheld, conditioned or delayed and at the Indemnifying Party's expense, to control the defense or response to any such action if it could affect the interests of any Indemnitee, and such undertaking by an Indemnitee shall not diminish the Indemnifying Party's obligations to Indemnitees hereunder, in any manner or form.  Under no circumstances shall any Indemnitee be required or obligated to seek recovery from third parties or otherwise mitigate its losses in order to maintain a claim under this indemnification and against the Indemnifying Party, and the failure of any Indemnitee to pursue such recovery or mitigate loss will in no way reduce the amounts recoverable by any Indemnitee from the Indemnifying Party. In the event the Indemnitees choose their own counsel, the Indemnifying Party shall have the right to approve any settlement in excess of fifty thousand dollars ($50,000.00) reached during the course of any such action, and Indemnifying Parties' approval of such settlement shall not be unreasonably withheld, conditioned or delayed.

(e)     The obligations of Indemnifying Party under this <u>Section 15</u> shall survive the termination or expiration of this Agreement.

(f)     Throughout the Term, Owner will maintain or caused to be maintained policies of commercial general liability insurance (including without limitation dram shop liquor liability insurance) with coverages and in amounts reasonably acceptable to Licensee. Such insurance policies shall name Licensee as an additional insured. The policy holders shall furnish evidence of such insurance upon execution of this Agreement and thereafter, at any time, within ten (10) days after written request from Licensee.  Licensee may, but is not obligated to, maintain or cause to be maintained a dram shop liquor liability insurance policy covering Licensee with coverages and amounts reasonably required by Licensee, the costs and premiums of which shall be the responsibility of Owner, at Owner's sole cost and expense.

16.     **Limitations of Performance**.  Notwithstanding any other provision in this Agreement to the contrary, Licensee shall be excused from the performance of its obligations under this Agreement (i) to the extent and whenever Licensee shall be prevented from performance by acts of God, war, insurrection, terrorism, riots, strikes, fire, failure of any applicable governmental authority to issue required governmental licenses or permits, and any other occurrence, event or condition beyond the reasonable control of Licensee; (ii) to the extent of an uncured material or monetary breach by Owner of any provision of this Agreement; and (iii) to the extent and whenever there is provided in this Agreement a limitation upon the ability of Licensee to expend funds.

17.     **Liquor Authorities.** Owner and Licensee agree that notwithstanding any of the provisions herein, if at any time during the Term, the liquor authorities require or prohibit any act on the part of Owner or Licensee, Owner or Licensee, as applicable, shall comply with such requirement or prohibition as the case may be, and any such compliance shall not be deemed a breach of this Agreement.

18.     **Power**.  Each of Licensee and Owner represents that it has the legal power, right and authority to enter into this Agreement and the instruments referenced herein, and to consummate the transactions contemplated hereby.

19.     **Authority**.  Each of the individuals executing this Agreement and the instruments referenced herein on behalf of Licensee and/or Owner represents that he or she has the legal right, power and authority to bind the party on whose behalf such individual is executing this Agreement and such other instruments to the terms and conditions hereof and thereof.

20.     **Validity**.  This Agreement is and shall be a valid, legally binding obligation of and enforceable against Licensee and Owner in accordance with its terms, subject only to applicable laws affecting or limiting the rights of contracting parties generally.

21.     **Survival**. Unless expressly stated to the contrary, all obligations by one party to the other shall survive the end of the Term.

22.     **Partial Invalidity**. If any of the phrases, sentences, clauses or paragraphs contained in this Agreement shall be declared invalid by the final and unappealable order, decree, or judgment of any court, this Agreement shall be construed as if such phrases, sentences, clauses or paragraphs had not been inserted, provided that the economic basis of this Agreement is not hereby altered.

23.     **Modifications; Waivers**. This Agreement may not be changed, modified or terminated, nor may any provision hereof be waived, except by a writing signed by the party to be charged with any such change, modification, termination or waiver. The waiver of any of the terms and conditions of this Agreement on any occasion or occasions shall not be deemed a waiver of such terms and conditions on any future occasion.

24.     **Limitation of Liability**. NO PARTY HERETO SHALL BE LIABLE TO ANY OTHER PARTY HERETO FOR ANY PUNITIVE, CONSEQUENTIAL, INCIDENTAL, SPECIAL OR INDIRECT DAMAGES.

25.     **Governing Law**. This Agreement shall be governed by, interpreted under, construed and enforced in accordance with the laws of [**State**] and the courts of such State shall have jurisdiction over any matters arising hereunder.

26.     **Assignment**. No party hereto may assign or transfer any of its rights or delegate any of its obligations under this Agreement to any other person, firm or company without the written consent of the others. Any such consent may be withheld in a party's sole and absolute discretion.

27.     **No Joint Venture**. Nothing in this Agreement creates a joint venture or partnership and, except as may be expressly set forth herein, no party is given the authority to bind or obligate any other party.

28.     **Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which, taken together, shall constitute one and the same

agreement.  This Agreement may be executed by facsimile or electronic signatures, which facsimile or electronic signatures shall be deemed an original of this Agreement.

29.    **Entire Agreement**. This Agreement contains the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes any discussions, offers, proposals, agreements or promises with respect thereto.

30.    **Enforcement**. This Agreement constitutes the entire agreement between the parties and supersedes any and all prior understandings or agreements.  Any changes or amendments to this Agreement must be in writing and signed by both parties.  Otherwise, this Agreement shall be binding on and inure to the benefit of the successors and assigns of the parties.  A waiver by either party of any term or condition of this Agreement shall not be deemed or construed as a waiver of the term or condition in the future, or a waiver of any subsequent breach of the Agreement.  This Agreement shall be construed according to its fair meaning and not strictly for or against either party.

31.    **Attorneys' Fees**.  In the event of any litigation, mediation, or arbitration in connection with or with respect to this Agreement, the prevailing party shall be awarded all costs, including, without limitation, reasonable attorneys' fees.

*[the rest of this page is intentionally left blank; signatures appear on following page]*

*[Signature Page, Interim Beverage Agreement]*

IN WITNESS WHEREOF, the parties hereto have duly executed this Interim Beverage Management Agreement as of the Effective Date.

**Licensee**

[Name of Debtor], LLC
a [●] limited liability company

By: _____
Name: _____
Title: _____

**Owner**

Balu Holdings, LLC,
 a Delaware limited liability company

By:_____
Name:  R. A. Spell
Title:   _____

**Schedule I**

**Licenses and Permits**

## **Exhibit B**

Form of Restrictive Covenant Agreement

(See attached)

## FORM OF RESTRICTIVE COVENANT AGREEMENT

This Restrictive Covenant Agreement (this "Agreement") is entered into as of [●], 2019, by and between Balu Holdings, LLC, a Delaware limited liability company ("Purchaser), and the Person listed as the Restricted Party on the signature page hereto (the "Restricted Party"). Capitalized terms used but not otherwise defined in this Agreement shall have the meanings assigned to them in the Purchase Agreement referred to below.

## PRELIMINARY STATEMENTS

A.  Pursuant to and subject to the terms and conditions set forth in the Asset Purchase Agreement (as amended, restated, supplemented or otherwise modified from time to time, the "Purchase Agreement"), dated as of September 9, 2019, by and among Eat Here Brands LLC, a Delaware limited liability company ("EHB"), Babalu Birmingham #1, LLC, an Alabama limited liability company, Babalu Atlanta #1 LLC, a Georgia limited liability company, Babalu Memphis #1, LLC, a Tennessee limited liability company, Babalu Memphis #2 LLC, a Tennessee limited liability company, Babalu Knoxville #1, LLC, a Tennessee limited liability company, and Babalu, LLC, a Mississippi limited liability company (each of the foregoing a "Seller" and collectively, "Sellers") and Purchaser (the "Transaction"). Capitalized terms used but not defined herein have the respective meanings ascribed to such terms in the Purchase Agreement.

B.  The Restricted Party is a member of the board of managers of EHB, which is the sole member of the other Sellers, and possesses or has access to valuable Confidential Information (as defined below) of the Sellers and other legitimate business interests representing the goodwill of the Sellers.

C.  The Restricted Party has reviewed this Agreement and agrees that the restraints imposed on the Restricted Party herein are reasonable and are no greater than are absolutely necessary to protect the Sellers's relationships with its employees.

D.  In order to assure that Purchaser receives and retains the full value of the assets and goodwill of the Sellers to be acquired pursuant to the Purchase Agreement, the parties hereto desire to set forth in this Agreement certain agreed-upon restrictions on the Restricted Party's activities following the Closing.

E.  The Restricted Party's agreement to the restrictions on the Restricted Party's post-Closing activities contained in this Agreement is a material condition of Purchaser's willingness to enter into the Purchase Agreement and to consummate the Transaction.

NOW, THEREFORE, in consideration of the foregoing premises and other consideration, the receipt and sufficiency of which is hereby acknowledged, the parties to this Agreement, intending to be legally bound, agree as follows:

1.    Employee/Independent Contractor Non-Solicitation; No-Hire.  From the Closing until the third (3rd) anniversary of the Closing (the "Non-Solicit Period"), whether as employee, agent, consultant, director, equity holder, member, manager, general or limited partner or in any other capacity, and whether directly or indirectly, the Restricted Party shall not, and the Restricted Party shall not knowingly cause or encourage any other Person to: (a) solicit, recruit, encourage or induce, or attempt to solicit, recruit, encourage or induce, any Person who is a Transferred Employee (collectively, the "Specified Individuals") to leave the service of the Purchaser; or (b) hire, employ, engage or attempt to hire, employ

or engage any of the Specified Individuals (whether as an employee, consultant, agent, independent contractor or otherwise), during such time as the Specified Individuals remain an employee of the Purchaser, or for twelve (12) months thereafter, provided that the foregoing shall not limit or otherwise restrict (x) general advertising or solicitation not specifically targeted at the Specified Individuals (it being acknowledged Sellers have non-Seller Affiliates on whose behalf Restricted Party may be working) and the hiring of any Specified Individuals who respond to such general advertising or solicitation or (y) the hiring of any Specified Individuals who are terminated by the Purchaser (provided Restricted Party has not directly or indirectly colluded with such Specified Person prior to such Specified Person's hiring in an effect to circumvent the restrictions of this Section 1.

2.     <u>Confidentiality</u>.

(a)     From and after the Closing, the Restricted Party shall, and shall direct and use commercially reasonable efforts to cause its attorneys, agents, advisors and other representatives ("<u>Representatives</u>") who receive Confidential Information from the Restricted Party or a Representative of the Restricted Party to, treat and hold as confidential all Confidential Information, and the Restricted Party shall not, and shall direct and use commercially reasonable efforts to cause its Representatives who receive Confidential Information from the Restricted Party or a Representative of the Restricted Party not to, use any Confidential Information or disclose any Confidential Information to any Person, except that the Restricted Party and his, her or its Representatives shall be permitted to disclose Confidential Information (i) to the extent necessary to comply with, or enforce his, her or its rights under, the terms of the Purchase Agreement or any other binding agreement between or among the Restricted Party and Purchaser or any of their respective Affiliates that is entered into in connection with the transactions contemplated by the Purchase Agreement (collectively, the "<u>Transaction Documents</u>"), (ii) in connection with the defense or prosecution of any action, suit or other proceeding ("<u>Action</u>") (including, any Action arising from or relating to the Transaction Documents or the transactions contemplated by the Transaction Documents), (iii) to any Governmental Body in the course of any examination, investigation, sweep or inquiry, and (iv) to its current or prospective partners, investors or financing sources in connection with ordinary course fund-raising, reporting or marketing activities (provided, that the recipients of Confidential Information pursuant to this clause (iv) are bound by customary confidentiality obligations with respect to such Confidential Information).  In addition, notwithstanding anything to the contrary contained in this <u>Section 2</u>, the Restricted Party and his, her or its Representatives shall be permitted to disclose any Confidential Information to the extent such disclosure is required by applicable law, order, subpoena or other legal process or other request by a Governmental Body; <u>provided</u>, that the disclosing Person shall, except as may be prohibited by applicable law or order, (i) provide Purchaser with reasonably prompt written notice of such requirement (unless prohibited from doing so by applicable law) to enable Purchaser to seek an appropriate protective order or other remedy with respect thereto, (ii) consult and cooperate with Purchaser with respect to taking reasonable steps to resist or narrow the scope of such request or legal process and (iii) use commercially reasonable efforts to ensure that all Confidential Information that is so disclosed will be afforded confidential treatment.

(b)     As used in this Agreement, "<u>Confidential Information</u>" means all oral and written non-public information, documents and materials of Sellers that constitute Purchased Assets, including the following to the extent they constitute Purchased Assets: trade secrets, client information, company policies, recipes, practices and codes of conduct, internal analyses, analyses of competitive products, strategies, marketing plans, financial information, information related to negotiations with third parties, information protected by the Sellers's privileges (such as the attorney-client privilege), internal audit reports, contracts and sales proposals, pricing and costs of specific menu items, products and services, training materials, employment records, performance evaluations, and other sensitive information, in each case, whether produced or distributed before or after the date of this Agreement; provided, however, "Confidential Information" shall not include any information that (x) is or becomes generally available to

2

the public other than as a result of Recipient's or its Representatives' breach of this Agreement or (y) is obtained by Recipient or its Representatives on a non-confidential basis from a third party that, to Recipient's knowledge, was not contractually restricted from disclosing such information. For the avoidance of doubt, information of non-Seller Affiliates of a Seller does not constitute Confidential Information.

      3.    <u>Enforcement</u>. If at the time of enforcement of <u>Section 1</u> or <u>Section 2</u> a court of competent jurisdiction holds that the restrictions stated in either Section are unreasonable under circumstances then-existing, including by reason of its extending over too great a period of time, too great a range of activities, or by reason of its being too extensive in any other respect, the parties hereto agree that the maximum period enforceable under such circumstances shall be substituted for the stated period. The parties also agree that a court of competent jurisdiction shall be allowed to revise the restrictions contained in those Sections as they are applied within such court's jurisdiction to cover the maximum period permitted by law. The parties hereto further agree that the Restricted Party's expertise in the business of the Sellers is of a special, unique, unusual, extraordinary, and intellectual character, which gives the Restricted Party's expertise a peculiar value. Consequently, the Restricted Party acknowledges and agrees that Purchaser and its Affiliates will suffer irreparable harm from a breach of <u>Section 1</u> or <u>Section 2</u> by the Restricted Party and that money damages will not be a reasonable or adequate remedy for any such breach. Therefore, in the event of a breach or threatened breach of this Agreement, Purchaser, its Affiliates and their successors or assigns shall be entitled to: specific performance and/or preliminary and permanent injunctive or other equitable relief from a court of competent jurisdiction in order to enforce, or prevent any violations of, the provisions hereof without (a) being required to post bond or other security or (b) having to prove the inadequacy of the available remedies at law. The Restricted Party further agrees that the rights and remedies set forth in the preceding sentence are in addition to other rights and remedies existing in favor of the Purchaser, its Affiliates and their successors or assigns. The Restricted Party also agrees: (x) the Non-Solicit Period shall be tolled, and shall not run, during the period of any breach of any such covenants; (y) each of Purchaser, the Sellers and any of their Affiliates shall have the right to enforce the Restricted Party's obligations under this Agreement; and (z) no claimed breach of this Agreement or the Purchase Agreement, or other violation of law attributed to Purchaser or any of its Affiliates, or change in the nature or scope of the Restricted Party's relationship with the Sellers or Purchaser, shall operate to excuse the Restricted Party from the performance of his, her or its obligations under this Agreement. The Restricted Party acknowledges and agrees that due to the proprietary nature of the business of the Sellers, the restrictions contained in this Agreement are reasonable (including as to duration, geographical area and scope) in light of the circumstances as they exist on the date upon which this Agreement is executed and are necessary to ensure the preservation, protection and continuity of such business, Confidential Information, trade secrets and goodwill of the Sellers. The Restricted Party acknowledges and agrees that the Restricted Party has either reviewed the provisions of this Agreement with its legal counsel or had the opportunity to do so and willingly declined that opportunity.

      4.    <u>Miscellaneous</u>.

        (a)    <u>Notices</u>. Any notice, request, demand, claim or other communication required or permitted to be delivered, given or otherwise provided under this Agreement must be in writing and must be delivered personally, delivered by nationally recognized overnight courier service or sent by e-mail (followed by recognized overnight courier service). Any such notice, request, demand, claim or other communication shall be deemed to have been delivered and given (a) when delivered, if delivered personally, (b) the Business Day after it is deposited with such nationally recognized overnight courier service, if sent for overnight delivery by a nationally recognized overnight courier service, or (c) the day of sending, if sent by e-mail prior to 5:00 p.m. (Memphis, Tennessee time) on any Business Day or the next succeeding Business Day if sent by e-mail after 5:00 p.m. (Memphis, Tennessee time) on any

3

Business Day or on any day other than a Business Day, in each case, to the following address or to such other address or addresses as such Party may subsequently designate to the other parties by notice given hereunder:

> if to the Restricted Party, to:
>
> > [●]
> > [●]
> > [●]
> > Attention: [●]
> > E-mail: [●]
>
> if to Purchaser:
>
> > Balu Holdings, LLC
> > [●]
> > [●]
> > Attention: [●]
> > E-mail: [●]
>
> with a copy (which shall not constitute notice) to:
>
> > Farris Bobango PLC
> > 999 S. Shady Grove Road, Suite 500
> > Memphis, Tennessee 38120
> > Attn: John A. Bobango
> > Email: jab@farris-law.com

Either party may change the address to which notices, requests, demands, claims, and other communications required or permitted hereunder are to be delivered by providing to the other party notice in the manner herein set forth.

(b)    <u>Amendment and Modification</u>. This Agreement may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by an instrument in writing signed on behalf of each party.

(c)    <u>Waiver</u>. No failure or delay of either party in exercising any right or remedy under this Agreement shall operate as a waiver of such right or remedy. Nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, or any course of conduct, preclude any other or further exercise thereof or the exercise of any other right or power. A waiver of any right or remedy on any one occasion shall not be construed as a bar to or waiver of any such right or remedy on any other occasion. Except as otherwise provided in this Agreement, the rights and remedies of the parties hereunder are cumulative and are not exclusive of any rights or remedies, which they would otherwise have under the Agreement. Any agreement on the part of either party to any such waiver shall be valid only if set forth in a written instrument executed and delivered by (x) a duly authorized officer on behalf of such party (in the case of an Entity) or (y) Restricted Party (in the case of Restricted Party).

(d)    <u>Assignment</u>. Neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned or delegated, in whole or in part, by operation of law or otherwise, by any party without the prior written consent of the other party. Any assignment without such prior

4

written consent shall be null and void. Notwithstanding the foregoing, the Purchaser may collaterally assign its rights and benefits under this Agreement, in whole or in part, to any debt financing source or to any Affiliate of Purchaser or any Person with whom Purchaser shall subsequently effect a merger or to whom Purchaser shall later transfer all or substantially all of its properties or assets, in each case, without the consent of the Restricted Party. No such assignment to a debt financing source or Affiliate of Purchaser will relieve the Purchaser of any of its obligations under this Agreement.

(e)     Third Party Beneficiaries. This Agreement shall be binding upon and inure solely to the benefit of each of the parties and their respective successors and assigns.  Except as expressly set forth in Section 3, nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature under or by reason of this Agreement.

(f)     Severability. Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law. In the event any provision or portion of any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or portion of any provision in such jurisdiction. In the event of any such finding, this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision or portion of any provision had never been contained herein.

(g)     Entire Agreement. This Agreement, the Purchase Agreement, and the other documents and instruments referred to herein and therein, constitute the entire agreement and understanding among the parties and supersedes all other prior agreements and undertakings, both written and oral, among the parties, or any of them, with respect to the subject matter hereof.  For the avoidance of doubt, this Agreement does not limit or supersede any other confidentiality, non-solicitation, no-hire or other restrictive covenant obligations set forth in any other agreement by and between the Restricted Party and Purchaser, the Sellers or any of their respective Affiliates.

(h)     Effectiveness. Notwithstanding anything herein to the contrary, the restrictions contained in this Agreement will become effective upon, and only upon, the Closing, and if the Purchase Agreement is validly terminated prior to the Closing, this Agreement shall automatically terminate and be of no further force or effect.

(i)     Counterparts. This Agreement may be executed in multiple counterparts (including by means of facsimile or portable document format (pdf) signature pages), any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same instrument.

(j)     Governing Law. All matters relating to the interpretation, construction, validity and enforcement of this Agreement shall be governed by and construed in accordance with the domestic laws of the State of Tennessee without giving effect to any choice or conflict of law provision or rule (whether of the State of Tennessee or any other jurisdiction) that would cause the application of laws of any jurisdiction other than the State of Tennessee.

(k)     Consent to Jurisdiction. THE PARTIES AGREE THAT JURISDICTION AND VENUE IN ANY ACTION (I) ARISING UNDER THIS AGREEMENT OR OR (II) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR THE TRANSACTION, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT,

5

EQUITY, OR OTHERWISE, SHALL PROPERLY AND EXCLUSIVELY LIE IN STATE OR FEDERAL COURTS SITUATED IN THE COUNTY OF FULTON AND STATE OF GEORGIA (INCLUDING THE APPROPRIATE APPELLATE COURTS THEREFROM). BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY WITH RESPECT TO SUCH ACTION. THE PARTIES IRREVOCABLY AGREE THAT VENUE WOULD BE PROPER IN SUCH COURTS, AND HEREBY WAIVE ANY OBJECTION THAT SUCH COURTS ARE AN IMPROPER OR INCONVENIENT FORUM FOR THE RESOLUTION OF SUCH ACTION. THE PARTIES FURTHER AGREE THAT THE MAILING BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, OF ANY PROCESS REQUIRED BY ANY SUCH COURTS SHALL CONSTITUTE VALID AND LAWFUL SERVICE OF PROCESS AGAINST THEM, WITHOUT NECESSITY FOR SERVICE BY ANY OTHER MEANS PROVIDED BY STATUTE OR RULE OF COURT. NOTWITHSTANDING THE FOREGOING, ANY PARTY MAY COMMENCE AN ACTION WITH ANY GOVERNMENTAL BODY ANYWHERE IN THE WORLD FOR THE SOLE PURPOSE OF SEEKING RECOGNITION AND ENFORCEMENT OF A JUDGMENT OR ORDER OF ANY COURT REFERRED TO IN THE FIRST SENTENCE OF THIS SECTION 4(K).

(l) <u>Time of Essence</u>. Time is of the essence with regard to all dates and time periods set forth or referred to in this Agreement.

(m) <u>No Presumption Against Drafting Party</u>. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event of an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto. No presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

(n) <u>Interpretation</u>. When a reference is made in this Agreement to a Section, such reference shall be to a Section of this Agreement unless otherwise indicated. The headings contained in this Agreement are for convenience of reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. All words used in this Agreement shall be construed to be of such gender or number as the circumstances require. The word "including" and words of similar import when used in this Agreement shall mean "including, without limitation", unless otherwise specified. Any reference to any federal, state, local or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. Unless the context requires otherwise, any definition or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on any such amendments, supplements or modifications set forth herein or therein).

*[The rest of this page is intentionally left blank; Signatures on following pages]*

13990967v3

IN WITNESS WHEREOF, the parties hereto, or their duly authorized representatives, have caused this Restrictive Covenant Agreement to be executed as of the date first set forth above.

**PURCHASER**:

BALU HOLDINGS, LLC

By:      _____
Name:
Title:

**THE RESTRICTED PARTY**:

[●]

By:      _____
Name:
Title:

<u>Schedule 1.1(d)</u>

Large Party Deposits

None.

Schedule 1.1(e)

Intangible Property Assets

| Serial Number | Reg. Number | Mark |
|---------------|-------------|------|
| 88080875 | 5714201 | Food Worth Sharing |
| 87489343 | 5379111 | Baba Rita |
| 87489410 | 5365115 | Baba Burger |
| 87410216 | 5323485 | Yours.Mine.Ours.Food Worth Sharing |
| 85401774 | 4386223 | Babalu |
| 85892790 | 4439446 | Eat Here Brands |

- Eatbabalu.com
- Babalufondren.com
- Babalujackson.com
- Babalums.com
- Babalutacos.com
- Babalutapas.com
- Eathere.com
- Eatherebrands.com
- All menus, recipe books and training materials of Sellers
- The following phone numbers:
  - Jackson - 601-366-5757
  - Overton - 901-274-0100
  - Birmingham - 205-297-0200
  - Knoxville - 865-329-1002
  - Memphis East  - 901-410-8909
  - Atlanta - 404-900-9595
- The books and records pertaining to the Business
- The following proprietary information of the Sellers relating to the Business:
  - All customer lists and other customer data bases
  - All marketing materials
  - All employee manuals
- Unregistered Trademarks
  - "*Babalu Tapas and Tacos*"
  - "*Babalu Tacos and Tapas*"
- Unregistered Copyrights
  - Copyrights to the website content on the websites disclosed above

13985303v2

<u>Schedule 1.1(f)</u>

Purchased Contracts

1.    Lease, dated June 29, 2016, by and between Crown Centre, LLC and Babalu-Memphis #2, LLC

2.    Standard Lease Agreement, dated October 17, 2013, by and between 29-Seven, LLC and Babalu-Birmingham #1, LLC

3.    Lease Agreement, dated July 30, 2010, by and between Fondren Place Development Company, LLC and Babalu, LLC, as amended by Lease Addendum I, dated on or about January 2012, by and between Fondren Place Development Company, LLC and Babalu, LLC, as further amended by Lease Addendum II, dated on or about November 2012, by and between Fondren Place Development Company, LLC and Babalu, LLC, as further amended by Lease Addendum III, dated on or about June 2013, by and between Fondren Place Development Company, LLC and Babalu, LLC, and as further amended by Fourth Amendment to Lease Agreement, dated October 30, 2015, by and between Fondren Place Development Company, LLC and Babalu, LLC

4.    Standard Lease Agreement, dated January 28, 2015, by and between Hatcher Hill & Associates, GP and Babalu Knoxville #1, LLC, as amended by that First Amendment to Lease, dated April 30, 2015, by and between Hatcher Hill & Associates, GP and Babalu Knoxville #1, LLC, as further amended by that Second Amendment to Lease, dated June 12, 2015, by and between Hatcher Hill & Associates, GP and Babalu Knoxville #1, LLC

5.    Standard Commercial Shopping Center Lease, dated August 12, 2013, by and between Overton Square South, LLC and Babalu Memphis #1, LLC

6.    Retail Lease Agreement, dated July 26, 2016, by and between 33 Peachtree Holdings, LP and Babalu Atlanta #1, LLC

<u>Schedule 1.1(g)</u>

Business Permits and Liquor Licenses

(See attached)

| LOCATION | ITEM |
| --- | --- |
| Fondren | Annual Food Permit - BAR - MS Dept of Health |
| Fondren | Annual Food Permit - MS Dept of Health |
| Fondren | Annual Report |
| Fondren | Personal Property Return |
| Fondren | Personal Property Tax Return |
| Fondren | State Health Permit |
| Fondren | State Alcoholic Beverage Permit - Catering |
| Fondren | State Beer Permit |
| Fondren | State LBD Permit - on premise |
| Fondren | City Privilege License |

| LOCATION | ITEM |
| --- | --- |
| Lakeview | City of Birmingham Business License |
| | |
| Lakeview | City of Birmingham Business License - Beverage and Liquor |
| Lakeview | City of Birmingham Business License - Gross Receipts (Food services and drinking places) |
| Lakeview | PPT - Business Privilege Tax |
| Lakeview | AL Business Privilege |
| | |
| Lakeview | State ABC License |
| | |
| Lakeview | Food Permit |
| Lakeview | County Business License |
| Lakeview | Personal Property Ad Valorem Return |
| Lakeview | Personal Property Tax Notice |

| LOCATION | ITEM |
|----------|------|
| Knoxville | Business Tax Standard License - County |
| | |
| Knoxville | Business Tax Standard License - City |
| Knoxville | Business Taxes - Gross Sales |
| Knoxville | Personal Property Tax Notice - County |
| Knoxville | Personal Property Taxes - City |
| Knoxville | Personal Property Tax Return |
| Knoxville | Annual Report - 786024 |
| | |
| Knoxville | TN Estimated Income Tax |
| | |
| Knoxville | TN Franchise and Excise Tax |
| | |
| Knoxville | TN Estimated Income Tax |
| Knoxville | State Health/Food Service Permit Payment - Bar and Restaurant |
| Knoxville | TN Estimated Income Tax |
| Knoxville | ABC Renewal (City) |
| Knoxville | LBD Price Schedule Submission |
| Knoxville | TN ABC License Renewal |
| Knoxville | TN Estimated Income Tax |

| LOCATION | ITEM |
|----------|------|
| Overton | City of Memphis - Liquor by the Drink Privilege Tax |
| Overton | Business Taxes - Gross Sales |
| Overton | County Property Tax Notice |
| Overton | Personal Property Tax Return |
| Overton | Annual Report |
| | |
| Overton | TN Estimated Income Tax |
| Overton | TN Franchise and Excise Tax |
| | |
| Overton | Business Tax Standard License - City/County (Combined) |
| Overton | Memphis+Shelby Sign Renewal Fee |
| | |
| Overton | ABC Renewal |
| Overton | TN Estimated Income Tax |
| | |
| Overton | Price Schedule |
| Overton | State Health/Food Service Permit Payment - Restaurant |
| Overton | Federal Alarm - Metro Alarm Permit |
| Overton | City of Memphis Property Tax |
| Overton | TN Estimated Income Tax |
| Overton | LBD Price Schedule Submission |
| Overton | City of Memphis Beer Permit |
| Overton | TN Estimated Income Tax |

| **LOCATION** | **ITEM** |
| --- | --- |
| Memphis 2 | City of Memphis - Liquor by the Drink Privilege Tax |
| Memphis 2 | Business Taxes - Gross Sales |
| Memphis 2 | County Property Tax Notice |
| Memphis 2 | Personal Property Tax Return |
| Memphis 2 | Annual Report - 855051 |
| Memphis 2 | TN ABC Liquor License |
| Memphis 2 | TN Estimated Income Tax |
| Memphis 2 | TN Franchise and Excise Tax |
| | |
| Memphis 2 | Business Tax Standard License - City/County (Combined) |
| Memphis 2 | TN Estimated Income Tax |
| Memphis 2 | State Health/Food Service Permit Payment - Restaurant |
| Memphis 2 | City of Memphis Property Tax |
| Memphis 2 | TN Estimated Income Tax |
| Memphis 2 | LBD Price Schedule Submission |
| Memphis 2 | City of Memphis Beer Permit |
| Memphis 2 | TN Estimated Income Tax |

| LOCATION | ITEM |
| --- | --- |
| Atlanta | City Business License |
| Atlanta | Annual Report |
| | |
| Atlanta | City Business License |
| | |
| Atlanta | City Business License |
| Atlanta | County Environmental Health - Restaurant |
| Atlanta | Dept of Watershed Managemnt |
| | |
| | |
| Atlanta | City Liquor License Renewal |
| Atlanta | State Liquor License Renewal |
| Atlanta | County Environmental Health - Bar |

Schedule 1.1(l)

Purchased Intellectual Property

The items set forth on Schedule 1.1(e) are hereby incorporated into this Schedule 1.1(l) by this reference.

<u>Schedule 1.3(b)</u>

Cure Costs

1.  Lease, dated June 29, 2016, by and between Crown Centre, LLC and Babalu-Memphis #2, LLC - Cure Costs - $18,544.60.

2.  Standard Lease Agreement, dated October 17, 2013, by and between 29-Seven, LLC and Babalu-Birmingham #1, LLC - Cure Costs - $10,512.50.

3.  Lease Agreement, dated July 30, 2010, by and between Fondren Place Development Company, LLC and Babalu, LLC, as amended by Lease Addendum I, dated on or about January 2012, by and between Fondren Place Development Company, LLC and Babalu, LLC, as further amended by Lease Addendum II, dated on or about November 2012, by and between Fondren Place Development Company, LLC and Babalu, LLC, as further amended by Lease Addendum III, dated on or about June 2013, by and between Fondren Place Development Company, LLC and Babalu, LLC, and as further amended by Fourth Amendment to Lease Agreement, dated October 30, 2015, by and between Fondren Place Development Company, LLC and Babalu, LLC - Cure Costs - $11,411.50.

4.  Standard Lease Agreement, dated January 28, 2015, by and between Hatcher Hill & Associates, GP and Babalu Knoxville #1, LLC, as amended by that First Amendment to Lease, dated April 30, 2015, by and between Hatcher Hill & Associates, GP and Babalu Knoxville #1, LLC, as further amended by that Second Amendment to Lease, dated June 12, 2015, by and between Hatcher Hill & Associates, GP and Babalu Knoxville #1, LLC - Cure Costs - $14,099.62.

5.  Standard Commercial Shopping Center Lease, dated August 12, 2013, by and between Overton Square South, LLC and Babalu Memphis #1, LLC - Cure Costs - $17,626.00.

6.  Retail Lease Agreement, dated July 26, 2016, by and between 33 Peachtree Holdings, LP and Babalu Atlanta #1, LLC - Cure Costs - $19,244.97.

13985303v2

<u>Schedule 2.4</u>

Excluded Liabilities

None.

<u>Schedule 7.2</u>

Soft Drink Supply Agreements

Each Acquired Restaurant has soft beverage equipment that is owned by Coca-Cola or its Affiliates and is comprised of:

- 1-2 fountain dispensing units with ice bin (located in the wait stations);
- 2-3 dispensing guns with ice bins (located in the bar); and
- Bag-in-the-box dispensing equipment, including racks, remote carbonators, valves/regulators, pumps and syrup lines and fittings.